THE STATE OF OHIO, APPELLEE, *v*. GOFF, APPELLANT.

[Cite as *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317.]

*Criminal law — Self-defense — Battered-woman syndrome — Court-ordered psychiatric examination of defendant by state's expert approved — Limits on testimony by state's examining expert exceeded — Right against self-incrimination violated.*

(No. 2009-1977 — Submitted October 12, 2010 — Decided December 30, 2010.)

APPEAL from the Court of Appeals for Lawrence County, No. 07CA17, 2009-Ohio-4914.

_____

PFEIFER, J.

{¶ 1} In this case, we are asked to determine whether a court order compelling a defendant to submit to a psychiatric examination conducted by a state expert in response to the defendant raising a defense of self-defense supported by expert testimony on battered-woman syndrome violates the defendant's right against self-incrimination under Section 10, Article I of the Ohio Constitution and the Fifth Amendment to the United States Constitution. We conclude that such an order does not violate a defendant's right against self-incrimination. However, we also hold that to preserve a defendant's right against self-incrimination, the examination of the defendant and the subsequent testimony from the state's expert must be limited to information related to battered-woman syndrome and whether the defendant's actions were affected by the syndrome. Since the examination and testimony of the expert in this case were not so limited, we hold that the defendant's rights under Section 10, Article I of the Ohio Constitution and the Fifth Amendment to the United States Constitution were violated.

**Factual and Procedural Background**

**{¶ 2}** On March 18, 2006, at approximately 7:00 p.m., defendant-appellant, Megan Goff, called Lawrence County 9-1-1. She had just shot her estranged husband, William Goff, 15 times in his head and upper body, emptying two guns. She pleaded for help, claiming that she was frightened that William, lying motionless on the floor of the home they once shared, would somehow kill her.

**{¶ 3}** Goff was indicted on March 28, 2006, charged with one count of aggravated murder with a firearm specification in connection with the death of her husband. Goff pleaded not guilty. Prior to trial, the state, knowing that Goff intended to present evidence on battered-woman syndrome to bolster a self-defense theory, moved the trial court to order Goff to submit to a psychiatric examination by the state's expert. Goff objected. The trial court ruled that if the defense brought in an expert on the matter, then the state was also entitled to offer expert testimony: "If the Defendant is going to bring in experts to talk about the Defendant's state of mind, etc., then the state should have the opportunity to rebut that."

**{¶ 4}** Goff submitted to an examination by the state's expert, Dr. Phillip Resnick. Resnick interviewed Goff in person in Cleveland, in the presence of her attorney, for seven hours and 40 minutes on August 11, 2006. He had an additional 18-minute follow-up interview with her by telephone. Resnick prepared a 35-page report.

**{¶ 5}** Goff waived her right to a jury, and the case was tried to a visiting judge who had not made the earlier ruling to allow the state's expert to examine Goff. Goff testified on her own behalf.

**{¶ 6}** Goff testified about her troubled history with William. They had met when she and her parents moved next door to him; he was about 40, and she was 15. They began a sexual relationship when she was 17 and were married when she graduated from high school.

**{¶ 7}** Goff testified that William was emotionally abusive to her throughout their seven-year marriage. When she did not do what he ordered her to do, he would threaten her with a gun. By 2004, she felt that she was not allowed to go outside of the house for anything. There were times when he shoved her to the floor and held a gun to her head; he would ask her how high she thought the blood would go once he shot her. She worked hard at doing what she thought would keep him calm but found that what had worked in the past was not working anymore.

**{¶ 8}** In December 2005, the emotional abuse worsened, and William began telling Goff that he was going to kill her and the children. On January 18, 2006, the situation escalated: William became physically abusive to their children, pushing their daughter and kicking their son, who was recovering from abdominal surgery, in the stomach. After that incident, Goff called the sheriff's department. A deputy responding to the call removed 63 guns from the house, many of them loaded. William was arrested, but was released from jail on January 19, 2006. That same day, Goff obtained a civil protection order.

**{¶ 9}** Goff and the children left their home, staying briefly at a shelter for victims of domestic violence; they moved from place to place because Goff feared that William would find them. Goff believed that he was tracking their whereabouts. According to Goff, in a March 17, 2006 telephone conversation with William, he told her that he was going to kill her and the children on Monday, March 20. The March 20 date was significant in the relationship because it was the date when the two first had intercourse, as well as being Goff's mother's birthday.

**{¶ 10}** Goff, alone but armed with two guns, returned to the marital residence on March 18. She thought she could talk Goff out of harming the children. She testified, "I knew him. I love him. I knew if he could just see me,

he would calm down. I just needed to see his face so that I knew what words to say and what, how to say them so that he would calm down."

{¶ 11} Goff testified that when she entered the home, William told her he was going to kill her and the children. He indicated that he knew where the children were staying. When she asked to leave, she testified, he kept repeating, "You're a dead woman and so are your kids." She claimed that she saw a look on his face that led her to believe he was going to kill her, and believing that he would kill her and the children, she shot him.

{¶ 12} Dr. Bobby Miller, a forensic psychiatrist, testified on Goff's behalf. He had interviewed Goff six times. He testified about the abusive nature of the Goffs' relationship and about battered-woman syndrome in general. He stated his opinion that Goff had symptoms of battered-woman syndrome and concluded, "At the time of the alleged offense, as a consequence of Mrs. Goff's being a victim of marital abuse, she had reason to believe and reasonably believed that she and her children were in imminent danger of death or serious physical injury." He testified to that opinion to a reasonable degree of medical probability.

{¶ 13} Resnick testified for the state. Goff objected to his testimony on the basis that his examination of her violated her right against self-incrimination. Goff's counsel stated that he had also objected during the examination when Resnick began discussing the events of the day of the shooting. He repeated that objection at trial. The court ruled:

{¶ 14} "The Court being not fully advised as to what the law is, the Court is going to rely on—I assume we had a hearing on this before the other Judge.

{¶ 15} "* * *

{¶ 16} "I'm going to sustain the ruling of the prior Court and proceed with the testimony * * *."

{¶ 17} From the start, Resnick testified not just about battered-woman syndrome, but about inconsistencies in what Goff told him in her interview

compared to what he had seen in the state's investigatory materials. Resnick outlined those inconsistencies at the state's urging:

{¶ 18} "Q. And go ahead and tell us about those inconsistencies, please.

{¶ 19} "A. All right. Well, first of all, there is some dispute between her versions of events and other versions of events. For example, she told me that Mr. Goff had threatened to kill her and the children on multiple occasions. Mr. Goff, when interviewed by the police on January 18th, denied that he had threatened her. Ms. Goff reported to me that on March 17th Mr. Goff explicitly threatened to kill her during a 6:00 P.M. phone call. I asked, I said, 'Are you sure that might've been the earlier call?' She said that she was certain that he had explicitly threatened to kill her and the children at the 6:00 P.M. phone call. There were witnesses to that 6:00 P.M. phone call who reported that Mr. Goff did not make any threats. Additional inconsistencies had to do with statements she gave the police on March 18th compared to the events she told me on August 18th. * * * The first was that she said that in the statement to the police she did not indicate that her intention was to miss and only scare her husband by not shooting to hit him. In the account she gave to me, she said that the first two shots she fired her goal was to scare him and not to hit his body. In reality, all fifteen shots she fired based on [the] autopsy did strike her husband. Final inconsistency had to do with the statement she gave to the police on March 18th. In that time she said that she fired when her husband turned around toward the window after the first shot. In the account she gave me, she said that after the first shot her husband was walking toward her as an explanation for why she continued to shoot.

{¶ 20} "* * *

{¶ 21} "Q. And also in reference to her report to you, in addition to that inconsistency of going ahead with the moving up on the porch, the statement that she made to you that there was the long gun incident and heard the safe tumbling,

5

was it your understanding that that was not contained in her statement to the police on the night of the murder as well?

**{¶ 22}** "A. That's correct. She did not mention that to the police.

**{¶ 23}** "Q. She also mentioned in your report, did she not, that he grabbed her arm and pulled her in the house?

**{¶ 24}** "A. That is the version she gave me, and that also was different from the police reports where she said she walked in."

**{¶ 25}** Resnick also testified as to his doubt that Goff feared her husband as much as she claimed. Resnick testified that Goff had told him that she was intensely fearful of her husband but that there were four items that caused him "to question the degree of the intensity of her fear":

**{¶ 26}** "The first of these was that when Mr. Goff was alleged to make new threats on March 17th, one day before the homicide, that he planned to kill her and the children the following Monday, which would be March 20th. That rather than involve the police or notify the police of these new threats in violation of the Protection Order, she instead decided that she would go alone to her husband's home to try and talk him out of it. That does not seem consistent with being terrified of him. Secondly, rather than involve her family and get their advice or protection, she instead consciously lied to her grandmother, left the children with them and then secretly went to her husband's home alone. Thirdly, she said she initially planned to approach the home unarmed, even though she told me that two weeks earlier she had spied on her husband from her father's house and had seen him carry two rifles into the home. Finally, Ms. Goff said that when she was on the porch, knocking on the door about to enter on March 18th, that she heard a creaking sound which she assumed was her husband getting a gun out of a gun safe. Rather than flee, she continued and proceeded with the confrontation."

**{¶ 27}** He noted that Goff initially explained that she went to the victim's house to let him kill her and that she took the two weapons simply to scare him, if

needed. He testified: "[T]he fact that she went to his home, that she initiated some of the exchanges of phone calls and the tone of the conversation on the March 4 taped portion of the call does not suggest that she is terrified of him. She speaks in a fairly assertive way and the fact that she goes to his home, as I already said, doesn't seem to suggest that she is as terrified as she reports."

{¶ 28} On the ultimate issue of whether symptoms of battered-woman syndrome caused Goff to legitimately fear imminent harm from William, Resnick explained that he could not form an opinion within a reasonable degree of medical certainty, partly because he could not determine Goff's credibility. He stated that his entire report rested upon the credibility of Goff's statements:

{¶ 29} "In many circumstances when I'm asked to do a forensic evaluation such as for insanity, I will reach a categorical opinion with reasonable medical certainty. In this case, I did not feel I could reach an opinion with reasonable medical certainty for a couple of reasons. One was it would depend upon whether Ms. Goff was believed about whether she was actually terrified of her husband, and I did not feel I was in the best position to make that judgment. His Honor will have the benefit of hearing other testimony that I will not have. So I did not feel I could reach an opinion. So what I did was simply try and lay out as clearly as I could different ways to look at the case to allow the ultimate trier [of] fact to make the proper decision. I tried to synthesize the various what [sic] she had told me, what the record showed and give some potential explanations, but to which of those is true, I could not conclude with reasonable medical certainty."

{¶ 30} Dr. Resnick then offered possible reasons why Goff had shot her husband:

{¶ 31} "Ms. Goff may have acted in anger because the moment she fired she said her husband was laughing at her and telling her that she lacked the guts to shoot him. Specifically, she said in her statement to the police that her husband

said, ' ["]You know you won't shoot me. You won't shoot me. You don't have the guts.["] So I lifted the gun up and he was laughing in my face, telling me he was going to kill the kids and that's when I pulled the first time and then it wouldn't pull again.' She said that every [sic] since she was a little girl, she was told she didn't have the guts and she also had brought in from her earlier molester when she was a child also laughed at her when she was in pain. So, I think one possibility is that rather than being actually in imminent fear at the time, she was just so angry and so challenged and so ridiculed that she chose to fire because he was laughing at her and challenging her as opposed to being in fear. I do have, Number 6 is, another possibility is that she was actually in fear of being immediately harmed. The second possibility is that she described, if her account is taken at face value, her husband, she may have shot her husband in anger because he had engaged in controlling behavior and allegedly made previous threats toward her and the children. In other words, that it was anger as opposed to imminent fear. The third possibility also involved anger because she found herself in a helpless position and this reminded her when she felt that she was in a helpless position while being molested at gun point as a child. The fourth possibility is a preemptive strike, that is that is [sic] separate, not being in imminent fear, but just deciding that even though she believed that her husband was going to come after her two days later on Monday, she just decided that she would go ahead and kill her husband at that time, rather than being in imminent fear. Then the final one is the possibility that she in deed [sic] was in the belief that she was in immediate fear and that, as she described it, that her husband would take the gun if she didn't shoot him and that she would be killed."

{¶ 32} In his closing argument, the prosecutor went back to Resnick's report, pointing out inconsistencies in Goff's version of events: "We gave Resnick everything we had. In fact, I think the other man had like nine or ten items listed in his report that he consulted. Forty-four. We gave him witness statements, we

gave him everything * * *. He asked her specifically on page 15, 'Did he threaten you at 6:01 on the 17th?' She said, 'Yeah, he threatened me and the kids.' That's not true. That is not true. That's important. How can you believe anything?"

{¶ 33} The day after Resnick testified, the court issued its decision from the bench, immediately after closing arguments, finding Goff guilty of aggravated murder. Goff appealed. The Fourth District Court of Appeals affirmed her conviction. On the issue of the trial court's order compelling Goff to undergo a psychiatric evaluation, the court held, "Because Goff initially retained her own psychiatrist to undergo an evaluation to prove her mental condition (battered woman syndrome) as part of her defense before the court granted the State's request for its psychiatric examination to rebut Goff's claim, we * * * find that Goff's use of her own psychiatric testimony at trial waived her privilege against self-incrimination." 2009-Ohio-4914, ¶ 1.

{¶ 34} The cause is before this court upon the acceptance of a discretionary appeal. *State v. Goff*, 124 Ohio St.3d 1442, 2010-Ohio-188, 920 N.E.2d 373.

## Law and Analysis

A. *Expert Testimony on Battered-Woman Syndrome in Self-Defense Cases*

{¶ 35} This court "[did] not establish a new defense or justification" in allowing the admission of expert testimony regarding battered-woman syndrome for the first time in *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970, paragraph three of the syllabus. Rather, this court held that expert testimony on battered-woman syndrome is admissible as evidence to prove one element of self-defense.

{¶ 36} Self-defense is an affirmative defense that requires a defendant to prove three elements by a preponderance of the evidence: "(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her

only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Thomas* (1997), 77 Ohio St.3d 323, 326, 673 N.E.2d 1339; R.C. 2901.05.

{¶ 37} In *Koss*, this court found testimony on battered-woman syndrome to be appropriate in relation to the second element of self-defense, that is, to "assist the trier of fact to determine whether the defendant acted out of an honest belief that she [was] in imminent danger of death or great bodily harm and that the use of such force was her only means of escape." *Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970, at paragraph three of the syllabus. The court noted that since Ohio has a subjective test for self-defense, "the defendant's state of mind is crucial to this defense." Id. at 215. Expert witness testimony on battered-woman syndrome could not only help triers of fact understand the syndrome in general, but could also help them understand a state of mind that they might not comprehend:

{¶ 38} " 'Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any "common sense" conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. See Walker, The Battered Woman, 19-31 (1979).' *State v. Hodges* (1986), 239 Kan. 63, 68-69, 716 P.2d 563, 567. See, also, *Smith v. State* [1981, 247 Ga. 612] 618-619, 277 S.E.2d [678]; *Hawthorne* [*v. State* (Fla.App.1982), 408 So.2d 801]; [*People v.*] *Torres* [1985, 128 Misc.2d 129] 133-134, 488 N.Y.S.2d [358]." Id. at 216.

{¶ 39} After *Koss,* the General Assembly recognized in R.C. 2901.06 that battered-woman syndrome "is a matter of commonly accepted scientific

10

knowledge" and that "the subject matter and details of the syndrome are not within the general understanding or experience of a person who is a member of the general populace and are not within the field of common knowledge." R.C. 2901.06(A)(1) and (A)(2). R.C. 2901.06(B) establishes that expert testimony is available for defendants to establish that they suffered from battered-woman syndrome in furtherance of proving self-defense:

{¶ 40} "If a person is charged with an offense involving the use of force against another and the person, as a defense to the offense charged, raises the affirmative defense of self-defense, the person may introduce expert testimony of the 'battered woman syndrome' and expert testimony that the person suffered from that syndrome as evidence to establish the requisite belief of an imminent danger of death or great bodily harm that is necessary, as an element of the affirmative defense, to justify the person's use of the force in question. The introduction of any expert testimony under this division shall be in accordance with the Ohio Rules of Evidence."

{¶ 41} *Thomas* provides an example of the type of testimony an expert might present in a self-defense case where battered-woman syndrome is a factor. In *Thomas*, the defendant's expert explained the classic symptoms and signs of battered-woman syndrome and then described her examination of the defendant. The expert testified that she diagnosed Thomas as suffering from battered-woman syndrome and stated her opinion that Thomas reasonably believed that she was in danger of imminent death or serious bodily harm at the time of the shooting. *Thomas*, 77 Ohio St.3d at 325, 673 N.E.2d 1339.

{¶ 42} Thus, in a self-defense case involving battered-woman syndrome, expert testimony plays a vital role in proving one element of the defense. The question we face here is whether both sides should have the opportunity to examine a defendant who claims that she suffers from battered-woman syndrome

or whether constitutional guarantees against self-incrimination should limit discovery regarding battered-woman syndrome to the defendant's expert.

*B. Compelled Psychiatric Examinations in Cases Involving*

*Battered-Woman Syndrome*

**{¶ 43}** Section 10, Article I of the Ohio Constitution provides, "No person shall be compelled, in any criminal case, to be a witness against himself * * *." This echoes essentially identical language from the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan* (1964), 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653. The essence of this basic constitutional principle "is the requirement that the State * * * produce the evidence against [the defendant] by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe v. Connecticut* (1961), 367 U.S. 568, 581-582, 81 S.Ct. 1860, 6 L.Ed.2d 1037.

**{¶ 44}** But when a defendant uses her mental status as a part of her defense and cooperates in an examination by her own expert, does she affect, even in a limited fashion, her right against self-incrimination? Must the factual issue of her mental status be subject to meaningful adversarial scrutiny?

**{¶ 45}** These issues have been addressed in only one Ohio case, *State v. Manning* (1991)*, 74 Ohio App.3d 19, 598 N.E.2d 25. In *Manning*, the defendant had shot her husband as he lay sleeping. In the lead-up to trial, it became apparent that Manning would claim self-defense and intended to employ testimony on battered-woman syndrome to bolster her defense. Manning was examined by her own expert; the trial judge ordered an independent examination by a state psychiatrist. Manning was examined by the same expert the state employed in this case, and he testified at trial.

**{¶ 46}** The court dealt with the same issue that we do – whether the defendant's Fifth Amendment rights were violated when the court ordered an

examination by the state and the state's expert testified at trial. As in this case, Manning's expert's testimony addressed the nub of the case; her expert testified that she believed that Manning was in fear of imminent bodily harm to either herself or her child at the time she shot her husband. Dr. Resnick testified in rebuttal. The court in *Manning* held, "When a defendant introduces psychiatric evidence and places her state of mind directly at issue, as here, she can be compelled to submit to [an] independent examination by a state psychiatrist. See *Buchanan v. Kentucky* (1987), 483 U.S. 402, 422-424, 107 S.Ct. 2906, 2917-2919, 97 L.Ed.2d 336, 355; *Isley v. Dugger* (C.A.11, 1989), 877 F.2d 47, 49; *Silagy v. Peters* (C.A.7, 1990), 905 F.2d 986, 1005." Id. at 24. The court in *Manning* also cited *Schneider v. Lynaugh* (C.A.5, 1988), 835 F.2d 570, 576, in which the court reasoned: "It is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony. The principle also rests on 'the need to prevent fraudulent mental defenses.' " As the court noted in *Manning*, none of the cases it cited involved testimony on battered-woman syndrome, but they were nonetheless instructive.

{¶ 47} Other high courts have addressed the issue. In *State v. Hickson* (Fla.1993), 630 So.2d 172, the court held that whether the state gets an opportunity for an independent examination of a defendant raising battered-woman syndrome as part of her self-defense defense depends on the type of testimony the defendant intends to present at trial. That is, presenting any evidence on battered-woman syndrome would not necessarily allow a compelled examination by a state expert. Thus, when a defense expert testifies generally as to battered-woman syndrome, e.g., including a description of the syndrome and characteristics of a person with battered-woman syndrome, including hypotheticals, the state would not be entitled to its own examination. But if the

defendant's expert testifies regarding whether the defendant suffered from battered-woman syndrome or acted pursuant to it, then the state is entitled to its own examination:

{¶ 48} "A defendant who takes the stand waives the privilege against compelled self-incrimination. If a defendant were able to rely on her statements being presented to a trier of fact through an expert's testimony, she would, in effect, be able to testify without taking the stand and subjecting herself to the state's questions. Allowing the state's expert to examine a defendant will keep the state from being unduly prejudiced because a defendant will not be able to rely on expert testimony that the state has no effective means of rebutting." Id. at 176.

{¶ 49} In *State v. Briand* (1988), 130 N.H. 650, 656, 547 A.2d 235, the court held that because a defendant is offering her own testimony indirectly when using an expert, she waives her right not to incriminate herself. "Because the expert's testimony is thus predicated on the defendant's statements, the latter are explicitly or implicitly placed in evidence through the testimony of the expert during his direct and cross-examination. Since a defendant would waive his privilege against compelled self-incrimination if he took the stand and made those same statements himself, his decision to introduce his account of relevant facts indirectly through an expert witness should likewise be treated as a waiver obligating him to provide the same access to the State's expert that he has given to his own, and opening the door to the introduction of resulting State's evidence, as the State requests here, to the extent that he introduces comparable evidence on his own behalf. Just as the State may not use a compelled psychological examination to circumvent the privilege against self-incrimination, see *Estelle* [*v. Smith* (1981)], 451 U.S. [454] at 463, 101 S.Ct. [1866, 68 L.Ed.2d 359], neither may a defendant voluntarily employ a psychological witness wholly to negate the waiver that his direct introduction of personal testimony would otherwise effect." Id. at 655-656.

{¶ 50} In *Mitchell v. State* (Nev.2008), 192 P.3d 721, 725, the defendant pleaded not guilty to murder, claiming that he fired shots in self-defense because his mental disorders, including posttraumatic stress disorder, caused him to overestimate the threat of attack and inhibited his ability to form the requisite mens rea to be guilty of murder. He had been examined by his own experts and intended to use their testimony at trial. At the state's request, the trial judge ordered the defendant to be examined by an independent psychiatrist. The Supreme Court of Nevada concluded that the trial court had not abused its discretion by ordering the examination. The court found the trial court's order appropriate for three reasons: First, "similar to the *Briand* court," the court held that the trial court "had the inherent authority to order the psychiatric examination * * * because the district court had the responsibility to promote the ascertainment of truth and to ensure the orderliness of the proceedings." Second, the court found *Manning* persuasive "because Mitchell placed his mental state directly into issue." Third, citing *Hickson*, the court found that without the state's own psychiatric examination of the defendant, Mitchell would benefit from "the unfair asymmetry of introducing his own favorable expert testimony based upon personal interviews, while limiting the State's ability to rebut his contentions to cross-examining those defense experts and introducing generalized expert testimony."

{¶ 51} The United States Supreme Court has implicitly found that when a defendant puts his mental status at issue and garners his own expert testimony, he is susceptible to examination by the state. In *Estelle v. Smith* (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, the defendant submitted to a competency hearing before the trial in his capital murder case. The court found the defendant competent to stand trial; the exam was not mentioned during the guilt phase of the proceedings. During the penalty phase, however, the state presented testimony from the psychiatrist who had conducted the competency evaluation; he opined

that the defendant posed a risk of future dangerousness, one of three findings the jury was required to make in order for a death sentence to be imposed. The jury found the death sentence appropriate.

{¶ 52} The court held that the psychiatrist's testimony violated the defendant's right against self-incrimination: "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." Id. at 468.

{¶ 53} The court found that by giving his opinion on future dangerousness, the psychiatrist had moved beyond the limited purpose of the competency examination, and it changed his role vis-à-vis the defendant: "When [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." Id. at 467.

{¶ 54} But the court implied that had the defendant initiated the psychiatric evaluation and sought to introduce evidence from it at trial, the result would have been different: "When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist." Id. at 465.

{¶ 55} In *Buchanan v. Kentucky* (1987) 483 U.S. 402, 422-423, 107 S.Ct. 2906, 97 L.Ed.2d 336, the court recognized that in *Estelle* it had "acknowledged that, in other situations, the State might have an interest in introducing psychiatric evidence to rebut petitioner's defense." The court in *Buchanan* addressed

16

*Estelle*'s holding that a criminal defendant who does not initiate his own psychiatric evaluation or attempt to introduce any psychiatric evidence cannot be compelled to respond to a psychiatrist:

{¶ 56} "This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution. See *United States v. Byers*, 239 U.S.App.D.C. 1, 8-10, 740 F.2d 1104, 1111-1113 (1984) (plurality opinion); *Pope v. United States*, 372 F.2d 710, 720 (C.A.8 1967) (en banc), vacated and remanded on other grounds, 392 U.S. 651 [88 S.Ct. 2145, 20 L.Ed.2d 1317] (1968)." Id.

{¶ 57} In *United States v. Byers* (1984), 239 U.S. App.D.C. 1, 740 F.2d 1104, then judge Antonin Scalia surveyed the numerous cases in which a defendant bringing an insanity defense supported by expert testimony was compelled to participate in a court-ordered examination. Courts had asserted numerous reasons why testimony from the state's expert did not violate the defendant's Fifth Amendment right against self-incrimination: waiver, estoppel, "the need to maintain a 'fair state-individual balance,' " a matter of "fundamental fairness," or "merely a function of 'judicial common sense.' " In reality, Judge Scalia stated, "they have denied the Fifth Amendment claim primarily because of the unreasonable and debilitating effect it would have upon society's conduct of a fair inquiry into the defendant's culpability. * * * We agree with this concern, and are content to rely upon it alone as the basis for our rejection of the Fifth Amendment claim." Id. at 1113.

{¶ 58} Based on the above authority, we conclude that when a defendant demonstrates an intention to use expert testimony from a psychiatric examination to establish that battered-woman syndrome caused in her "a bona fide belief that

she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force," *State v. Thomas*, 77 Ohio St.3d at 326, 633 N.E.2d 1339, i.e., to use testimony on battered-woman syndrome to prove the second element of self-defense, a court may compel the defendant to submit to an examination by another expert without violating the defendant's rights under Section 10, Article I of the Ohio Constitution and the Fifth Amendment to the United States Constitution. By putting her mental state directly at issue and introducing expert testimony based upon her own statements to the expert, the defendant opens the door to a limited examination by the state's expert concerning battered-woman syndrome and its effect on the defendant's behavior. Courts have the inherent authority to preserve fairness in the trial process, and allowing the defendant to present expert testimony on the specific effects of battered-woman syndrome on the defendant while denying the prosecution the ability to introduce such evidence would unfairly handicap the prosecution and prevent the trier of fact from making an informed decision. We thus conclude that the trial court did not err in ordering Resnick's examination of Goff in this case.

### C. *Limits on Testimony of the State's Expert*

{¶ 59} The limitation on a defendant's bedrock constitutional right against self-incrimination must be carefully tailored to avoid any more infringement than is necessary to ensure a fair trial. The paramount concern of fairness of the trial requires only that the state be given the same opportunity to present testimony on battered-woman syndrome as the defendant. When the expert in *Estelle* testified as to matters beyond the purpose of the compelled examination, the court found a violation of the defendant's Fifth Amendment right. The court found that the expert's "role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Estelle,* 451 U.S. at 467, 101 S.Ct. 1866, 68 L.Ed.2d 359.

{¶ 60} We find that Resnick's role changed in this case in a manner similar to the expert's role in *Estelle*. Psychiatric testimony is one thing—testifying about discrepancies regarding the defendant's recitation of facts and questioning the truth of her representations regarding her own level of fear are more akin to "recounting unwarned statements made in a postarrest custodial setting." Id. R.C. 2901.06 describes the type of testimony appropriate in a case involving battered-woman syndrome: testimony about the syndrome in general, testimony regarding whether the defendant experienced the syndrome, and testimony concerning whether the syndrome accounts for the requisite belief of imminent danger of death or great bodily harm to justify the use of the force in question.

{¶ 61} Resnick testified that he was unable to form an opinion on whether Goff was symptomatic of battered-woman syndrome. He thus did not have much to offer as expert testimony on the issue about which he was called to testify. Instead, he testified at length about inconsistencies in statements Goff had made to him compared to other evidence the state had provided him. Armed with over 40 items of evidence provided by the state, he essentially became another cross-examiner of Goff and reported to the court areas where he found her testimony wanting. Before even any substantive mention of battered-woman syndrome in his testimony, the state elicited from Resnick examples of Goff's inconsistencies regarding the time period right around the killing.

{¶ 62} Resnick also testified that Goff had told him that she was intensely fearful of her husband but that "there were four items which caused [him] to question the degree of the intensity of her fear." Instead of comparing her level of fear to a person with battered-woman syndrome, or discussing whether her actions in response to that fear were consistent with those with someone with battered-woman syndrome, he questioned whether she was truly as fearful as she had told him. Again, her *veracity* was at issue.

{¶ 63} Resnick's testimony was not focused on battered-woman syndrome. Instead, he presented an overarching theory of the case rather than testimony about the part battered-woman syndrome played in the case. Resnick testified: "So I did not feel I could reach an opinion. So what I did was simply try and lay out as clearly as I could different ways to look at the case to allow the ultimate trier [of] fact to make the proper decision." He testified as to the specific statements that Goff had made during the compelled examination, demonstrated how those statements were not consistent with the state's evidence against her, and, based upon the statements made to him during the examination, speculated through six alternative theories as to Goff's motivation for shooting her husband.

{¶ 64} Resnick's testimony was that Goff's credibility meant everything in the case. He set forth inconsistencies in her story and questioned whether she was truthful to him, but stated that after eight hours of interviews, he had no opinion on whether she was truthful or not. This nonopinion actually functioned as an opinion on her credibility. That was not his role. In his closing argument, the prosecutor commented on the shifting stories that Resnick had detected from his interviews with Goff. In announcing his decision, the trial judge indicated that he was influenced by the testimony:

{¶ 65} "In this case I have weighed the evidence, both positive and negative in this matter. I too feel that the issues should be determined by whether or not the defendant, the Court deems the defendant's testimony as being truthful. This goes along with Dr. Resnick's position, and I think he very openly said that if the Court believed Mrs. Goff's testimony, then the Court in fact should strongly consider the self defense as an appropriate verdict."

{¶ 66} We conclude that although the trial court did not err in ordering a psychiatric examination of Goff, the examination and subsequent testimony established that Resnick exceeded the boundaries of what was necessary to provide a level playing field between the state and the defense as to expert

20

testimony. Resnick went beyond determining whether Goff suffered from battered-woman syndrome; "his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." 451 U.S. at 467, 101 S.Ct. 1866, 68 L.Ed.2d 359. As in *Estelle*, "[t]he Fifth Amendment privilege, therefore, is directly involved here because the State used as evidence against respondent the substance of [her] disclosures during the pretrial psychiatric examination," and "the results of that inquiry were used by the State for a much broader objective that was plainly adverse to respondent." Id. at 464-465.

{¶ 67} We therefore find that Resnick's testimony violated Goff's right against self-incrimination guaranteed by Section 10, Article I of the Ohio Constitution and the Fifth Amendment to the United States Constitution. Accordingly, we reverse the judgment of the court of appeals and remand the matter to the trial court.

Judgment reversed

and cause remanded.

BROWN, C.J., and LUNDBERG STRATTON, O'CONNOR, LANZINGER, and CUPP, JJ., concur.

O'DONNELL, J., concurs in judgment.

_____

**O'DONNELL, J., concurring in judgment.**

{¶ 68} In this case, the majority opens the door to allow prosecutors the opportunity to conduct mental examinations of defendants who allege battered woman's syndrome in connection with the defense of self-defense without the statutory authority to do so. I do not agree that when a defendant asserts battered woman's syndrome as an element of self-defense in a criminal case, a court should order that defendant to submit to a state-requested psychiatric examination, particularly in circumstances as presented here, where the state

psychiatrist not only probed whether the defendant suffered from battered woman's syndrome, but testified to facts obtained during the mental examination that aided and supported the state's case. Thus, while I agree with the majority that Megan Goff's Fifth Amendment rights were violated when the trial court permitted the state's expert to testify essentially like an agent of the state, I cannot join the majority, because in my view, the trial court erred in ordering Goff to submit to the state psychiatric examination.

{¶ 69} The General Assembly has provided guidance with respect to the use of expert witnesses in cases in which the issue of battered woman's syndrome is raised by a defendant. R.C. 2901.06 permits a defendant to "introduce expert testimony of the 'battered woman syndrome' and expert testimony that the person suffered from that syndrome as evidence to establish the requisite belief of an imminent danger of death or great bodily harm that is necessary, as an element of the affirmative defense [of self-defense], to justify the person's use of the force in question."

{¶ 70} Similarly, R.C. 2945.392 permits a defendant to introduce expert testimony of battered woman's syndrome if she enters a plea to the charge of not guilty by reason of insanity in order "to establish the requisite impairment of the defendant's reason, at the time of the commission of the offense."

{¶ 71} Thus, the General Assembly has authorized a defendant to offer expert testimony in connection with battered woman's syndrome both in a self-defense context and when a defendant enters a plea of not guilty by reason of insanity. Moreover, as recognized by the majority, this court has sanctioned the use of battered woman's syndrome to prove an element of the defense of self-defense. *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970, paragraph three of the syllabus. In *Koss*, this court determined: "Admission of expert testimony regarding the battered woman syndrome does not establish a new defense or justification. It is to assist the trier of fact to determine whether the

22

defendant acted out of an honest belief that she is in imminent danger of death or great bodily harm and that the use of such force was her only means of escape." Id.

{¶ 72} Furthermore, in R.C. 2945.371(A), the General Assembly has authorized the court to order an evaluation in the context of competency or an insanity defense. However, notably absent from the statute is any authorization for the prosecutor to ask the court to order a mental examination of a defendant in the context of a claim of battered woman's syndrome in connection with the defense of self-defense.

{¶ 73} Accordingly, the General Assembly could have provided for court ordered state-requested mental examinations in all cases where evidence of battered woman's syndrome is presented by a defendant, but it chose not do so. Instead, in R.C. 2901.06, it provided that a defendant may introduce expert testimony of battered woman's syndrome as evidence to establish the requisite belief of an imminent danger of death or great bodily harm as a necessary element of the affirmative defense of self-defense, but it declined to specify that the prosecutor may request or that a court may order a mental examination of the defendant in such circumstances. Thus, the only expressly authorized examination of a defendant arises in situations involving competency or the defense of not guilty by reason of insanity. In my view, the omission of the opportunity for a prosecutor to seek an examination of a defendant asserting battered woman's syndrome as part of the affirmative defense of self-defense in R.C. 2945.371 indicates legislative intent to limit mental examinations involving battered woman's syndrome to circumstances involving competency or an insanity defense.

{¶ 74} Thus, the state should be precluded from obtaining a mental examination in this case because the General Assembly has not authorized such an exam to be conducted. As Goff did not raise an insanity defense or issues

relating to her competency to stand trial, the trial court improperly ordered her to submit to a mental examination merely because she asserted battered woman's syndrome in connection with her defense of self-defense. Accordingly, I concur in the judgment to reverse, but for different reasons.

_____

J.B. Collier Jr., Lawrence County Prosecuting Attorney, and Robert C. Anderson, Assistant Prosecuting Attorney, for appellee.

Kravitz, Brown & Dortch, L.L.C., Paula Brown, William Bluth, and Richard Parsons, for appellant.

Timothy Young, Ohio Public Defender, and Kristopher A. Haines, Assistant Public Defender, urging reversal for amicus curiae Ohio Public Defender.

Andrew Stevenson, urging reversal for amicus curiae Ohio Association of Criminal Defense Lawyers.

Mellissia Fuhrmann, urging reversal for amicus curiae Justice League of Ohio.

Lorie McCaughan, urging reversal for amicus curiae Capital University Family Advocacy Clinic.

Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, and Matthew A. Kanai, Assistant Solicitor, urging affirmance for amicus curiae Ohio Attorney General.

_____