[Cite as *State v. Bitting*, 2019-Ohio-2304.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 29238 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DARNELL LEWIS BITTING | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2018-03-0709 |

DECISION AND JOURNAL ENTRY

Dated: June 12, 2019

CALLAHAN, Judge.

**{¶1}** Defendant-Appellant, Darnell Bitting, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** Mr. Bitting was arrested as a result of a tragic shooting that occurred late one evening in Akron. He was spending that evening at a home on Mercer Avenue when a woman with whom he was having a sexual relationship came to the house. The woman ("Mother") had her four children with her, but left them in her car with the grandmother of two of the children. Once the grandmother and the children departed, Mother approached the house on foot.

**{¶3}** Mother brought a hammer with her and ultimately used it to break several of the house's porch windows. Mr. Bitting, who was in the front living room at the time, retrieved an AK47 and carried it to the front door. Mother ran from the porch and spotted her car coming down the street. As the car approached the front of the house and Mother ran toward it, Mr.

Bitting fired his rifle. The bullet traversed the yard, entered the car's open rear passenger window, and bypassed three of Mother's children before striking the fourth child in the head and killing her. The police apprehended Mr. Bitting the following afternoon.

{¶4} A grand jury indicted Mr. Bitting on one count of murder, one count of felony murder, six counts of felonious assault, one count of having a weapon under disability, and eight attendant firearm specifications. Before his trial commenced, Mr. Bitting pleaded guilty to having a weapon under disability. His remaining counts and specifications were tried to a jury with Mr. Bitting testifying in his own defense. Though he asked the court to instruct the jury on self-defense, the court refused to tender the instruction. The jury then found Mr. Bitting guilty on each of the submitted counts and specifications.

{¶5} Mr. Bitting subsequently filed a motion for a new trial, citing the trial court's error in refusing to instruct the jury on self-defense. The State responded in opposition and, upon review of the written filings, the court denied Mr. Bitting's motion. The court sentenced him to a total of 54 years to life in prison.

{¶6} Mr. Bitting now appeals from his convictions and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED WHEN IT REFUSED TO INCLUDE A JURY INSTRUCTION FOR SELF-DEFENSE[.]

{¶7} In his sole assignment of error, Mr. Bitting argues that the trial court abused its discretion when it refused to instruct the jury on self-defense. Upon review, this Court rejects his argument.

{¶8} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. "This Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68. "'A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke v. Menke*, 9th Dist. Summit No. 27330, 2015-Ohio-2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-24, 2015-Ohio-1999, ¶ 25. "'A trial court's failure to give a proposed jury instruction is only reversible error if the defendant demonstrates that the trial court abused its discretion, and that the defendant was prejudiced by the court's refusal to give the proposed instruction.'" *State v. Sanders*, 9th Dist. Summit No. 24654, 2009-Ohio-5537, ¶ 45, quoting *Azbell v. Newark Group, Inc.*, 5th Dist. Fairfield No. 07 CA 00001, 2008-Ohio-2639, ¶ 52.

{¶9} "A defendant has the burden of establishing the affirmative defense of self-defense by a preponderance of the evidence." *State v. Gates*, 9th Dist. Summit No. 24941, 2010-Ohio-2994, ¶ 7. Where a defendant has used deadly force, he must prove that

> "(1) [he] was not at fault in creating the violent situation, (2) [he] had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) that [he] did not violate any duty to retreat or avoid the danger."

*State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997); Former R.C. 2901.05. "[A] trial court need only instruct the jury on self-defense if the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable [jurors] concerning the existence of such issue." *State v.*

*Reed*, 9th Dist. Summit No. 27755, 2016-Ohio-5123, ¶ 15, quoting *State v. Hatfield*, 9th Dist. Summit No. 23716, 2008-Ohio-2431, ¶ 8. "Evidence is sufficient where a reasonable doubt of guilt has arisen based upon a claim of self-defense. If the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." (Internal citation omitted.) *State v. Melchior*, 56 Ohio St.2d 15, 20 (1978).

{¶10} Mother testified that she and Mr. Bitting had a sexual relationship, and, on the evening of the shooting, she was angry with him about several personal matters. Though she had arranged for the grandmother of her two eldest children to watch all four of her children that evening, Mother, her four children, and the grandmother ultimately left the grandmother's house in Mother's car. It was after 10:00 p.m. when they arrived at the house where Mother knew Mr. Bitting to be staying. While the grandmother and the children left in Mother's car to go purchase fast food, Mother approached the house on foot.

{¶11} Mother acknowledged that she had a hammer in her car and brought it with her as she walked up to the house. As she stepped onto the front porch, she looked through a window and saw Mr. Bitting sitting on a couch watching television. According to Mother, she knocked on a window and used a loud voice to speak to Mr. Bitting. Apart from insulting her and telling her to leave, however, Mr. Bitting ignored her. She testified that his behavior enraged her, so she began using her hammer to break the porch windows. As she did so, Mr. Bitting stood up, turned on a light, walked over to the television, and picked up a large gun. Fearing that he meant to shoot her, Mother ran from the porch in the direction of the street.

{¶12} Mother testified that she dropped to the ground before she made it to the street because she believed she heard a gunshot. She then saw her car approaching and began yelling

at the grandmother to keep driving. As she yelled, she heard a gunshot and saw her car speed away. She then turned and saw Mr. Bitting run back into the house with his gun. Once he had gone inside, Mother ran down the street and found her car stopped about a block away. She then discovered that her four-year-old daughter had been shot in the head.

{¶13} The grandmother testified that, on the night of the shooting, she drove Mother and her four children to a house. The grandmother left Mother there and took the children for fast food, but had not yet made it to the corner of the street when she heard booming noises through the open car windows. Because she did not know what the noises were or where they were coming from, the grandmother decided to drive around the corner and return to the house where she had left Mother. As she drove toward the house, she spotted Mother lying on the ground. Although Mother ran for the car and tried to open the door, the grandmother testified that she kept driving because she "was hearing gunshots or something." She testified that she stopped the car further up the street and Mother then opened the car door. After Mother did so, they discovered that Mother's four-year-old had been shot.

{¶14} The homeowner who lived across the street from the house where Mr. Bitting was staying also testified at trial. He stated that, on the evening of the shooting, he was watching television in his upstairs bedroom when he heard glass breaking outside. Looking out his window, he saw a young woman breaking the porch windows of the house across the street. He continued to watch for several minutes, at which point the front door opened and the woman jumped from the porch. He testified that the woman ran and fell near the street where a car had pulled up. Though she tried to get inside the car, she was unable to do so, and the car continued moving. The homeowner watched as a man came out onto the porch and fired a gun. He testified that it was too dark to see the gun itself, but the flash of gunfire was evident. Following

the gunshot, the homeowner stepped away from the window until he heard someone yelling for help because "the baby been shot." He then looked out his window again and saw a white car arrive at the house across the street. As he watched, the man from the house got into the white car, and the car drove away. The homeowner testified that only the man got into the white car and he never saw the man with any children.

{¶15} Following the shooting, officers from the crime scene unit inspected the house where Mr. Bitting had been staying. They found two cartridges there, one of which had been fired and one of which was unfired. The unfired cartridge was located on the floor just inside the front doorway, and the fired cartridge (i.e., the casing) was located on the porch at its southernmost end. There was testimony that both cartridges were 7.62 millimeters, a size most commonly associated with assault rifles like an AK47 or British SKS. A firearms analyst from the Bureau of Criminal Investigation confirmed that the location of the fired cartridge was consistent with the shooter having fired his rifle from a position out on the porch. He described the type of assault rifle used as a "powerful weapon," noting that its typical barrel length is longer than 18 inches.

{¶16} Detective Clayton Cozart spoke with Mother at the hospital, at which point in time she identified Mr. Bitting as the shooter. Mother admitted that she had broken the porch windows at the house, but denied owning or carrying a gun. Additionally, Detective Cozart testified that the police were unable to find any evidence of bullet holes or gunshot damage to the house. The detective visited the house after speaking with Mother and described it as being situated at a higher elevation than the sidewalk. He testified that the shooter had fired downhill from the porch, toward the street, and that the bullet had traveled through the open, rear passenger's window of Mother's car.

{¶17} Lieutenant Erik Wells spoke with Mr. Bitting on the telephone at about 6:00 a.m. the following morning. He testified that Mr. Bitting called the station because he had heard what happened and wanted to make it clear that he was not present when the shooting occurred. Although Mr. Bitting said he would come to the station to give a statement, he never did so. Instead, his sister arrived some two hours later and spoke with Detective Cozart. Detective Cozart testified that the sister initially corroborated Mr. Bitting's version of the events, which was that he was not at the house that evening, she was there with a man, and the man was the one responsible for the shooting. At that point, however, an officer showed the sister a picture of the victim. Detective Cozart testified that the picture caused the sister to vomit and to retract her statement. Although she admitted that her initial statement was not true, the sister refused to provide the police with any additional information.

{¶18} Detective Gary Shadie testified that Mr. Bitting was arrested later that afternoon. He interviewed Mr. Bitting at the station and described him as talkative and cooperative. Mr. Bitting informed the detective that he sometimes stayed at the house where the shooting occurred and used to bring his kids there, but no longer did so. He repeatedly denied that he had been at the house the previous evening. He informed Detective Shadie that his sister had been at the house with some man and that he had heard the man had been the shooter. Mr. Bitting claimed that he had last seen Mother about two days before the shooting. According to Detective Shadie and Detective Cozart, Mr. Bitting never claimed to have acted in self-defense. Instead, he fervently maintained that he was not involved because he was not there when the shooting occurred. Both detectives testified that the first time they heard Mr. Bitting's self-defense theory was at trial, some eight months after the shooting.

{¶19} Mr. Bitting testified in his own defense. He told the jury that he lied when he spoke to the police because he was afraid of what would happen if he told the truth. He testified that, on the evening of the shooting, he was staying at the house in question with his two young children. T.L., a female friend of his, came to the house with food, and the group sat down to eat around 9:45 or 10:00 p.m. Mr. Bitting claimed that they were eating when he heard a banging at the back door and opened it to find Mother there with a gun. Mother was angry, and she and T.L. exchanged words before Mr. Bitting convinced T.L. to leave. According to Mr. Bitting, Mother became hysterical once T.L. left, flung her gun around as she screamed, and shot a hole through the living room wall. He testified that he then ordered her to leave and she did so at about 10:15 p.m.

{¶20} Mr. Bitting testified that, a short while later, he and his children were watching television when the porch windows began to shatter. He claimed that Mother never announced herself, he did not know she was outside, and he thought he was "under heavy fire." Mr. Bitting testified that his children were screaming as the windows broke and that he used his body to cover them. He then retrieved his AK47 from under the couch, went to the front door, and cocked the weapon, expelling an unfired cartridge as he did so. According to Mr. Bitting, he saw a black car with tinted windows when he looked outside, but did not recognize it. He stated that he did not see anyone on the porch, but heard someone running. With his young son wrapped around his leg and his daughter pleading for comfort, Mr. Bitting fired the rifle as a warning. He testified that, after he fired, the black car stopped moving and remained stationary for a short period of time. He then came out onto the porch and instructed his young son to sit down on the steps while he looked around. At that point, he saw a woman running from the driveway to the black car. The car then sped off without the woman.

{¶21}  According to Mr. Bitting, he fired his rifle that evening because he feared for his life and the lives of his children.  He claimed that it never occurred to him the person outside might be Mother.  Instead, he thought he "was under attack on a drive-by shooting" and acted on instinct.  He testified that, directly after the black car drove away, he called for a ride and left with his kids in a white car.

{¶22}  T.L., the woman that Mr. Bitting said he was with that evening, testified on his behalf.  She stated that she arrived at the house around 9:50 p.m. with food for herself, Mr. Bitting, and his two children.  She claimed that Mother arrived about ten minutes later and was banging on the front door and screaming.  T.L. testified that Mother barged in and threatened to kill her as well as Mr. Bitting.  Though she said there was something in Mother's hand, she claimed that it was too dark to see what Mother was holding.  T.L. stated that she left the house around 10:10 p.m., so she was not there when the shooting occurred.  She acknowledged that, at the time of the shooting, she was pregnant with Mr. Bitting's child.

{¶23}  Mr. Bitting requested a self-defense instruction, arguing that he was in fear for his life and the lives of his children when he fired his AK47.  The trial court refused to issue the instruction.  The court found that Mr. Bitting had failed to set forth sufficient evidence which, if believed, would raise a question in the minds of reasonable jurors concerning the existence of that issue.  The court found that Mr. Bitting's testimony was riddled with "holes" and contrary to significant evidence, such as the testimony of the impartial homeowner who had witnessed much of the incident.  Because Mr. Bitting had failed to set forth sufficient evidence in support of his affirmative defense, the court refused to instruct the jury on self-defense.

{¶24}  Mr. Bitting argues that the trial court abused its discretion when it refused to instruct the jury on self-defense because there was ample evidence that he feared for his life and

the lives of his children. He notes that there was evidence Mother had sent him threatening text messages in the days leading up to the shooting. Additionally, he points to the testimony that, directly before the shooting, Mother came to the house and threatened him and T.L. with a gun. Mr. Bitting argues that his testimony served as evidence that he fired his rifle because he thought someone was shooting at him and his children. He asserts that any question as to the credibility of that evidence was a matter for the jury to decide and that the trial court, by refusing to issue a self-defense instruction, essentially substituted its own judgment for that of the jury.

{¶25} To the extent Mr. Bitting relies on any evidence that Mother sent him threatening text messages or threatened him with a gun prior to the shooting, he has not demonstrated how that evidence bears upon his claim of self-defense. Mr. Bitting specifically testified that he did not know Mother was outside the house when the porch windows began to break. He stated that it never occurred to him Mother was responsible, Mother never announced herself, and he did not recognize her car. Accordingly, it is unclear how any evidence that she threatened him before the shooting is relevant to his claim that, at the time of the shooting, he had a bona fide belief that he was in imminent danger. *See Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, at ¶ 36, quoting *Thomas*, 77 Ohio St.3d at 326.

{¶26} Having reviewed the record, this Court cannot conclude that the trial court abused its discretion when it refused to instruct the jury on self-defense. *See Calise*, 2012-Ohio-4797, at ¶ 68. As noted, "a trial court need only instruct the jury on self-defense if the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable [jurors] concerning the existence of such issue." (Alteration sic.) *Reed*, 2016-Ohio-5123, at ¶ 15, quoting *Hatfield*, 2008-Ohio-2431, at ¶ 8. The evidence that Mr. Bitting produced at trial was insufficient to generate reasonable doubt as to his guilt. *See Melchoir*, 56 Ohio St.2d

at 20. The jury heard testimony that, up until the first day of trial, Mr. Bitting firmly maintained that he was not present when the shooting occurred. Moreover, none of the other evidence presented at trial supported his version of the events. *See State v. Little*, 9th Dist. Lorain No. 10CA009758, 2011-Ohio-768, ¶ 25. T.L. admitted that she left the house before the shooting occurred, so she was unable to offer any testimony as to the events that transpired once she left. Mother testified that she briefly spoke with Mr. Bitting before breaking the porch windows and that, once he grabbed a large gun, she ran. Her testimony was consistent with that of the homeowner across the street who testified that he saw a young woman break the porch windows, jump from the porch, and run before a man emerged from the house and fired a gun. The forensic evidence also supported Mother's testimony, as there was testimony that the position of the fired cartridge at the southernmost end of the porch was consistent with the shooter having been standing near that end of the porch when he fired. At that point, according to Mother, the grandmother, and the homeowner across the street, Mother had already fled and was attempting to get to her car. Mr. Bitting failed to show that, at that point, he possessed a bona fide belief that he was in imminent danger. *See id.* at ¶ 25-26.

{¶27} At best, Mr. Bitting's evidence generated "only a mere speculation or possible doubt" as to his guilt, and thus, was insufficient to warrant a self-defense instruction. *Melchoir* at 20. Because he failed to set forth reasonably sufficient evidence in support of his claim of self-defense, the trial court did not abuse its discretion by refusing to issue the instruction. *See Little* at ¶ 25-26. *See also State v. Palmer*, 80 Ohio St.3d 543, 562-563 (1997); *Melchoir* at 20-21. As such, Mr. Bitting's sole assignment of error is overruled.

III.

**{¶28}** Mr. Bitting's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

TEODOSIO, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

DONALD R. HICKS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO GUEST, Assistant Prosecuting Attorney, for Appellee.