[Cite as *State v. Shearer*, 2018-Ohio-1688.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2017-07-102 |
| | : | O P I N I O N<br>4/30/2018 |
| - vs – | : | |
| | : | |
| DAWN RACHEL SHEARER, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2017-03-0367

Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Mary K. Martin, 4600 Duke Dr., Suite 101, Mason, Ohio 45040, for defendant-appellant

**S. POWELL, P.J.**

{¶ 1}  Defendant-appellant, Dawn Rachel Shearer ("Shearer"), appeals from her conviction in the Butler County Court of Common Pleas after a jury found her guilty of murdering her ex-husband, Anthony Shearer ("Tony").  For the reasons outlined below, we affirm.

**The Arrest of Shearer**

{¶ 2}  On the evening of February 6, 2017, Shearer was arrested for the murder of

Tony and transported to the Butler County Jail. Once there, Shearer confessed to detectives to shooting Tony in the head. Two days later, on February 8, 2017, Shearer appeared at her arraignment and entered a plea of not guilty. Thereafter, on March 3, 2017, a preliminary hearing was held before the Middletown Municipal Court. Following this hearing, the matter was bound over to the Butler County Grand Jury and bond was set at $250,000. It is undisputed that Shearer did not post bond, thereby remaining in the Butler County Jail at all times relevant.

**The Indictment and Pretrial Proceedings**

{¶ 3} On April 5, 2017, the Butler County Grand Jury returned a four-count indictment charging Shearer with two counts of murder in violation of R.C. 2903.02(B), both unclassified felonies, as well as two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2), both second-degree felonies. Each of the four counts also included a firearm specification as provided by R.C. 2941.145. According to the bill of particulars, the charges arose after it was alleged Shearer shot and killed Tony on the evening of February 6, 2017 while the two were at the house located at 3601 Ellis Way, Middletown, Butler County, Ohio. The matter was subsequently scheduled for trial on April 24, 2017.

{¶ 4} On April 13, 2017, Shearer filed a motion requesting the matter be tried to a jury. That same day, Shearer's trial counsel filed a notice indicating his intent to use experts at trial, including, among others, Dr. Kenneth Manges, a forensic psychologist, and Dr. Harry Plotnick, a forensic toxicologist. Later that day, the trial court issued an entry granting Dr. Manges access to Shearer while she was in the Butler County Jail for purposes of conducting a forensic interview "so that he may have the opportunity [to] testify in her trial as an expert witness." Shortly thereafter, on April 17, 2017, Shearer's trial counsel provided the state with a report Dr. Manges compiled following his interview with Shearer. It is undisputed, however, that the report submitted by Dr. Manges specifically stated the

- 2 -

"interview and evaluation process [was] not complete."

{¶ 5} Beginning on April 14, 2017, the state filed a series of motions requesting the trial court exclude from trial any evidence regarding battered-woman's syndrome and posttraumatic stress disorder, as well as any evidence regarding Shearer's own mental health and/or diminished capacity. The state also moved the trial court to prohibit both Dr. Manges and Dr. Plotnick from testifying at trial since Shearer failed to comply with the timing requirements of Crim.R. 16(K). Pursuant to that rule,

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 6} On April 20, 2017, the trial court held a pretrial hearing on the matter. As part of this hearing, the trial court heard arguments from both parties as to whether Dr. Manges and/or Dr. Plotnick would be permitted to testify since Shearer had admittedly not complied with the timing requirements of Crim.R. 16(K). When confronted with this issue, Shearer's trial counsel argued that he had done "everything possible" to comply with Crim.R. 16(K), but that Shearer was now stuck with the decision of whether she should waive her right to a speedy trial or forfeit her ability to call Dr. Manges and/or Dr. Plotnick to testify at trial. To this, the trial court stated:

> [T]he Court understands that [Shearer] wishes to exercise her right to a speedy trial and has attempted to protect that by setting the trial for Monday, April the 24th. However, the Court will also extend to you the opportunity to request a continuance if you feel that you're prejudiced to the point where you need additional time to prepare. The Court could try this case in mid-June if you would like, but that's up to you and [Shearer]. So I don't – just put that on the record that the Court would entertain

- 3 -

a motion to continue the trial if you believe it is necessary so that you can adequately prepare your client's case.

Shearer's trial counsel initially declined the trial court's invitation, but noted that he would need to speak with Shearer before any final determination could be made.

{¶ 7} Following this exchange, the trial court determined that Dr. Plotnick would not be permitted to testify at trial due to Shearer's failure to comply with Crim.R. 16(K). Similarly, as it relates to Dr. Manges, who the record indicates was prepared to offer his expert opinion on battered-woman's syndrome and posttraumatic stress disorder, the trial court determined he too would not be permitted to testify at trial. However, instead of excluding Dr. Manges' testimony based on a violation of Crim.R. 16(K), the trial court instead based its ruling on the Ohio Supreme Court's decision in *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, which held:

> [W]hen a defendant demonstrates an intention to use expert testimony from a psychiatric examination to establish that battered-woman syndrome caused in her "a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force," i.e., to use testimony on battered-woman syndrome to prove the second element of self-defense, a court may compel the defendant to submit to an examination by another expert without violating the defendant's rights under Section 10, Article I of the Ohio Constitution and the Fifth Amendment to the United States Constitution.

*Id*. at ¶ 58, quoting *State v. Thomas*, 99 Ohio St.3d 323,326 (1997).

Continuing, the Ohio Supreme Court then stated in *Goff*:

> By putting her mental state directly at issue and introducing expert testimony based upon her own statements to the expert, the defendant opens the door to a limited examination by the state's expert concerning battered-woman syndrome and its effect on the defendant's behavior.

*Id*.

Finally, the Ohio Supreme Court stated in *Goff*:

Courts have the inherent authority to preserve fairness in the trial process, and allowing the defendant to present expert testimony on the specific effects of battered-woman syndrome on the defendant while denying the prosecution the ability to introduce such evidence would unfairly handicap the prosecution and prevent the trier of fact from making an informed decision.

*Id.*

{¶ 8} Applying the principles outlined by the Ohio Supreme Court in *Goff* to the case at bar, the trial court stated:

And based on that the Court believes it's being put into a position where either the Court permits the testimony of Dr. Manges and doesn't allow the State to have an expert examine [Shearer] with regards to that issue, the Court would be put in the position of defying the Ohio Supreme Court and would be, by the language of that very decision, creating unfairness and preventing the trier of fact from making an informed decision. And the Court is simply not going to do that. So the Court believes it must, based on that case, grant the motion in limine and exclude Dr. Mange's testimony unless the State has the opportunity for an examination of [Shearer] in this case.

{¶ 9} Thereafter, when asked if he was prepared to go forward with the jury trial as scheduled, Shearer's trial counsel informed the trial court that he would need to discuss the matter with Shearer. Specifically, Shearer's trial counsel stated:

Obviously, that changes the situation for her. I would argue that we are not if we're unable – because at this point she has to now choose between whether she waives her speedy right to trial or waives her right to call an expert as a witness. I think that I have to sit [and] discuss with her whether or not she wants to make that an appellate issue or whether she wants to ask for a continuance.

{¶ 10} The following day, April 21, 2017, and after discussing the matter fully with Shearer, Shearer's trial counsel filed a motion to continue. In support of this motion, Shearer's trial counsel stated that because he had just "received over 700 pages of discovery 3 business days before the scheduled trial" from the state, he had been prevented "from being able to present necessary evidence in [Shearer's] defense." Therefore,

according to Shearer's trial counsel, "[Shearer] must decide which Constitutional right to waive. On advice of counsel, she has decided to waive her right to a trial within 90 days of arrest based on the idea that the current Jury Trial can be continued to a June 2017 date."

{¶ 11} Later that same day, the trial court granted Shearer's motion to continue and ordered that all expert reports be disclosed and exchanged between the parties by May 26, 2017. The trial court thereafter granted the state's motion requesting permission for their expert, Dr. Jennifer O'Donnell, a forensic psychologist, to interview Shearer at the Butler County Jail "regarding Battered Person's Syndrome and [Shearer's] thoughts and actions as it relates to the Syndrome." The record indicates that all expert reports were then disclosed and exchanged between the parties in accordance with the trial court's previous order on the same.

**The Trial**

{¶ 12} A five-day jury trial was held on June 19 through June 23, 2017. During this time, the jury heard testimony from numerous witnesses, including Shearer herself. The following is a summary of that testimony and the evidence presented at trial.

*The State's Case-in-Chief*

{¶ 13} The state's first witness was Dr. Mary Elizabeth Goolsby, a deputy coroner and forensic pathologist with the Montgomery County Coroner's Office, who, after conducting an autopsy of Tony's body, determined that Tony's cause of death was a homicide resulting from a single gunshot wound to the head. Dr. Goolsby, however, was unable to offer her opinion regarding the exact distance from where the gun was fired in relation to Tony's head. Rather, as Dr. Goolsby testified, assuming there was nothing between the gun Shearer used and Tony's head, "it could have been a few inches to a few feet to a distant range such as a mile or two."

{¶ 14} The state's next witness, a woman who lived near where Tony was shot,

testified that at approximately 7:45 p.m. on the day in question, she saw Shearer run out of the house located at 3601 Ellis Way and proceed to the right side of her car parked in the driveway before running back inside the house. According to this witness' testimony, nobody was chasing Shearer at the time. This witness also testified that she did not think anything out of the ordinary upon seeing Shearer that evening. Approximately one hour later, however, this witness testified that she and her husband noticed a large police presence outside the house located at 3601 Ellis Way and that the house had been totally roped off "[s]o something bad has really happened."

{¶ 15} Detective Kristy Hughes with the Middletown Police Department then testified for the state. Detective Hughes, who also works overtime as a 9-1-1 dispatcher, testified she received a 9-1-1 call from Shearer at 8:27 p.m. on the night in question. A recording of that 9-1-1 call between Detective Hughes and Shearer was then authenticated and played for the jury. As part of this recording, Shearer can be heard telling Detective Hughes she shot Tony because "we were arguing over stuff." Shearer can also be heard telling Detective Hughes she thought she shot Tony in the head, but that she was not exactly sure where.[1] At no time during this 9-1-1 call, however, did Shearer ever claim to have shot Tony in self-defense, nor did Shearer ever state that Tony had been choking her, hitting her, or abusing her in any way prior to the shooting.

{¶ 16} Next was Officer Christine Sorrell with the Middletown Police Department who testified for the state. Officer Sorrell testified she was dispatched to 3601 Ellis Way at 8:28 p.m. on the night in question on reports that there had been a shooting, taking approximately one minute to arrive at the scene. Before arriving at the scene, however, Officer Sorrell testified she turned on her lights and siren, thereby also activating her in-car cruiser camera

---

1. The record is unclear as to whether Shearer was referring to where in the house she shot Tony or where the bullet had actually hit him.

and microphone. The recording from Officer Sorrell's in-car cruiser camera was then authenticated and played for the jury, which shows Officer Sorrell arriving at the scene and contacting Shearer, who appeared somewhat unsteady and slow. Upon making contact with Shearer, Officer Sorrell testified that Shearer repeatedly stated, "I don't know what I did." When asked if she noticed anything about Shearer's speech, Officer Sorrell testified Shearer's speech was "slightly slurred," thus giving Officer Sorrell the impression Shearer may have been under the influence of either drugs or alcohol.

{¶ 17} After placing Shearer in the back of her cruiser, Officer Sorrell testified she then went into the house located at 3601 Ellis Way where she found Tony lying unresponsive on the living room floor. A photograph of Tony's body as discovered by Officer Sorrell was then shown to the jury. This photo shows Tony face down on the living room carpet with a large pool of blood around his head. Upon seeing Tony's body, Officer Sorrell testified she reached down to see if Tony was breathing or if there was anything that could be done before the ambulance arrived. It is undisputed that Tony was not breathing at that time.

{¶ 18} Once the ambulance arrived, Officer Sorrell testified she went outside to her cruiser and spoke with Shearer, who, upon Officer Sorrell opening the door, exhibited the smell of an alcoholic beverage on her person. Not seeing any injuries to Shearer, nor receiving any complaints from Shearer that she was injured, Officer Sorrell testified she then transported Shearer to the police station where detectives were awaiting her arrival. During this brief drive, Officer Sorrell testified Shearer repeatedly stated, "I don't know what I did."

{¶ 19} Officer Connor Kirby with the Middletown Police Department then testified for the state. Officer Kirby testified he was the second officer to arrive at the scene upon being dispatched to 3601 Ellis Way on reports of a shooting. Once there, Officer Kirby testified

that he acted as the cover officer for Officer Sorrell after Shearer was ordered to walk backwards from the house towards them. During this time, Officer Kirby testified Shearer repeated three or four times "I don't know what I did, I don't know what I did," before Officer Sorrell handcuffed her and placed her in the back of her cruiser.

{¶ 20} After Shearer was placed in the back of Officer Sorrell's cruiser, Officer Kirby testified he retrieved crime scene tape from his cruiser and secured the scene. When asked if he saw any injuries to Shearer that evening, Officer Kirby testified that he did not. Officer Kirby then testified that he too noticed a "strong" order of alcoholic beverage on Shearer's person. Specifically, Officer Kirby testified:

> It was just a strong odor. It almost knocks you down. It comes right at you. You immediately know when you smell it. It just had a strong odor to it consistent with beer or an intoxicating beverage.

{¶ 21} Officer Brook McDonald with the Middletown Police Department was the next witness to testify for the state. In addition to serving as a patrolman, Officer McDonald testified he also served as an evidence technician. In explaining his duties as an evidence technician, Officer McDonald testified that he is tasked with collecting any evidence that could be valuable to the investigation; more specifically, "[a]ny evidence that could potentially prove innocence or guilt."

{¶ 22} As it relates to the night in question, Officer McDonald testified he was dispatched to 3601 Ellis Way upon receiving a report that a female had shot her husband. As the fourth officer to arrive at the scene, Officer McDonald testified he and another officer cleared the area to make sure nobody else was inside the house. Upon entering the house, Officer McDonald testified he saw Tony lying unresponsive face down on the living room carpet. When asked if he attempted to provide any medical care to Tony, Officer McDonald testified that he did not "due to the injury to his head, I felt that if I tried anything that it could

potentially make things worse."

{¶ 23} Once the ambulance arrived, Officer McDonald testified he began photographing the scene. These photographs, which were properly authenticated, depict a bullet hole in the living room wall believed to be related to this shooting, as well as the weapon Shearer used in the shooting, a Springfield Armory XD-S 9mm semi-automatic pistol. These photographs also included images of a rifle located in the kitchen, several other firearms that were in a locked gun safe in the garage, as well as photos of Tony's van parked in the driveway seemingly blocking in Shearer's car. When asked about these photos, Officer McDonald testified that it was fair to say he photographed and collected anything and everything that he thought could be involved in the shooting.

{¶ 24} Detective Vince Lovejoy with the Middletown Police Department then testified for the state. Detective Lovejoy testified he arrived at 3601 Ellis Way at 9:15 p.m. on the night in question after receiving a report that "a female had shot her husband in the head." Detective Lovejoy, who also served as an evidence technician, testified that he and Officer McDonald obtained a search warrant and thereafter processed the scene. As Detective Lovejoy testified, this included conducting a walkthrough of the house and taking photographs of anything and everything they believed was important to their investigation, such as the firearm Shearer used in the shooting, bullets, a gun cleaning kit, a broken gun case, and a cell phone, all of which were located in the living room where the shooting took place.

{¶ 25} Andrew McClelland, a forensic scientist who specializes in firearms for the Ohio Bureau of Criminal Investigations, then testified for the state. McClelland testified he tested the operability of the firearm Shearer used to shoot Tony as part of his duties working as a forensic scientist. According to McClelland, the pistol Shearer used was operable in that it was capable of expelling a bullet as intended. McClelland also testified that the spent

shell casing located at the scene was fired from the weapon Shearer admittedly used to shoot Tony.

{¶ 26} Officer Minic with the Middletown Police Department was the next witness to testify for the state. Officer Minic, who serves as both patrolman and an evidence technician, testified he arrived at 3601 Ellis Way at 8:29 p.m. on the night in question upon reports that there was a shooting. Upon arriving at the scene, Officer Minic testified he found "a subject suffering from a gunshot wound." Thereafter, upon being assigned to photograph and collect items from the victim, Officer Minic testified he was dispatched to the nearby hospital where Tony was taken for further medical treatment. Once there, Officer Minic took photographs and collected Tony's clothing before responding to the police department to collect DNA samples from Shearer. Officer Minic then testified he took photos of Shearer and obtained DNA samples of her mouth and hands, during which time Officer Minic testified Shearer "asked why we were doing a search warrant for her hands, when she stated that she had shot him."[2]

{¶ 27} Detective Elizabeth Stewart with the Middletown Police Department then testified for the state. Detective Stewart testified that she received a call at 8:41 p.m. on the night in question regarding a homicide that took place at 3601 Ellis Way. As the on-call detective that day, Detective Stewart testified she contacted Sergeant Carrozza before responding to the scene. Once at the scene, Detective Stewart contacted Officer Kirby, the officer assigned to maintain a log of individuals going into and out of the house, before speaking with Sergeant Carrozza, who informed her that Officer Sorrell had taken Shearer to the police station to be interviewed. Upon being so informed, Detective Stewart testified

---

2. It should be noted, a video recording of Officer Minic's interactions with Shearer indicates Shearer actually asked Officer Minic why he was taking a swab of her mouth, not her hands, prior to informing Officer Minic that "[she] shot him."

she then went inside the house located at 3601 Ellis Way where she looked around for approximately 12 minutes before going back to the police station to interview Shearer.

{¶ 28} A video recording of Detective Stewart interviewing Shearer was then authenticated and played for the jury. As part of this interview, which began at 9:41 p.m., Shearer informed Detective Stewart she and Tony had previously been married for 23 years. However, after Tony had a nervous breakdown in 2012 because of alleged sexual abuse he sustained as a child, Tony's behavior changed, thus prompting their divorce. Shearer then told Detective Stewart that Tony had been receiving treatment for posttraumatic stress disorder, but that his treatment stopped due to his lack of insurance. Nevertheless, in hopes of reconciling their marriage, Shearer informed Detective Stewart she had been staying with Tony for the past few months "to work things out." Shearer then stated:

> Tony's sick. But I've got my own issues and it's just been very hard. Because Tony never laid his hands on me. And its been like that the last five years and that's what set that off tonight, I thought man you ain't putting your hands on me again. Because Tony wasn't like that before his nervous breakdown. So, not that I made a wise decision.

{¶ 29} In addition to this statement, Shearer can also be heard on the video recording stating "[t]his ain't me. I would never do this." Although the video recording indicated as much, when asked if Shearer ever said anything about being choked, beaten, or that she was in fear for her life, Detective Stewart testified "No." Detective Stewart further testified that she did not see any injuries to Shearer's person during her interview of Shearer, but did notice that Shearer had an odor of alcoholic beverage on her person.

{¶ 30} The following day, after Shearer was booked into the Butler County Jail, and after a search warrant was obtained for Shearer's person, Detective Stewart testified she also photographed Shearer. When asked why she took these pictures when Officer Minic

had already done so the day before, Detective Stewart testified she "wanted to move clothing so I could get closer pictures and perhaps pictures of areas that were underneath her clothing." Detective Stewart further testified that Shearer "didn't really give me much information of what had occurred that night. And just to do a complete investigation, I felt that it was necessary to have documentation of any injuries, even though she did not report any to me." As observed by Detective Stewart, these photos revealed some faint scratching on Shearer's chin and her right collarbone, injuries that were not present on the photos taken by Officer Minic. Stewart's photos also showed faint scratches, bruising, and/or light redness to Shearer's right forearm, elbow, neck, right lower back, and left bicep. Reiterating her prior testimony, Detective Stewart again testified that Shearer never complained of any injuries, nor did Shearer ever ask for any medical attention.

{¶ 31} Following the admission of its exhibits, the state rested its case-in-chief. Shearer then moved for acquittal under Crim.R. 29(A), which the trial court denied.

*Shearer's Defense*

{¶ 32} As the first witness called in Shearer's defense, a woman testified that she saw two people – one a man and the other a woman – "fussing" outside the home located at 3601 Ellis Way on the night in question. Continuing, this witness testified she watched as the man "raised their hand up. I don't know exactly if it was a hit or what, but I know it was a man and a woman standing outside that house over there. And I'm like, wow." This witness, however, could not identify who these people were or when this incident took place. As this witness testified, "I don't know who it was out there with the commotion that was going on." This witness further testified that she did not know what happened and could not say "if he struck her or what happened. I don't know." Concluding, this witness testified she then heard "someone screaming saying call the police, call the police," and watched as several police cruisers and an ambulance arrived at the scene.

{¶ 33} The next witness to testify in Shearer's defense was Jessica Kruse. Kruse, the owner, next door neighbor, and property manager of the house located at 3601 Ellis Way, testified she "heard some yelling" coming from next door while she out on her front porch, but that "[i]t was not clear enough to make out what the yelling was in regards to or what even was being said." As Kruse testified, to the best of her recollection, "I remember yelling and it might have been like something maybe glass breaking or something along those lines. It just sounded like a lot of commotion going on over there." Kruse then testified she saw Shearer come out of the house and go around to her car parked in the driveway, "so when she went outside and all that, I kind of took my kids inside because at that point I didn't know if the incident was going to come out into the street." Kruse did not provide any further testimony or evidence regarding the shooting.

{¶ 34} James Murdock then testified in defense of Shearer. Murdock, who had been Shearer's chiropractor since October 21, 2014, testified Shearer at one point mentioned to him "that she thought maybe some of her neck pain could have been from getting hit in the head a lot in the past by her husband." Murdock further testified he remembered Shearer "specifically saying she thought she possibly might have some of her neck problems from in the past being hit in the head a lot." To this, Murdock, not a psychologist himself, testified he "thought some of her symptoms were related to a psychological situation so I referred her to a specialist," later identified as Dr. Jeffrey Baker. Thereafter, when asked about when this alleged abuse may have occurred, Murdock testified Shearer told him "she thought maybe it could have started her whole neck problem years ago," but that "[i]t wasn't directly at that current time."

{¶ 35} Dr. Baker then testified in Shearer's defense. Dr. Baker, who is a clinical psychologist, licensed independent chemical dependency counselor, and clinical supervisor for the state of Ohio, testified he treated Shearer for "symptoms of fear and

depression" on four occasions between January 6, 2016 through August 17, 2016. According to Dr. Baker, he first treated Shearer on January 6, 2016, during which she exhibited a "high degree of emotional disturbance" resulting from her being in an abusive relationship "that was both emotionally and physically abusive" and also "that her father had been physically abusive" and that "her mother had been very emotionally abusive." Dr. Baker testified he next treated Shearer on February 3 and February 26, 2016, while she was "in a deep, dark place. I call it just a doom and gloom," which he attempted to treat by "trying to help her unhook from these intense negative feelings and thoughts." Dr. Baker then testified he wanted to do a "desensitizing exercise to try to tone down some of this emotional intensity," but that he "never got a chance to do that because I didn't see her again until months later on [August 17, 2016]."

{¶ 36} Nevertheless, when asked by Shearer's trial counsel what was the basis of Shearer's fear and depression, the following exchange occurred:

> [DR. BAKER]: Well, on [January 6, 2016], the fear was primarily about her husband and she was afraid of seeing his white van and kept having, almost preoccupied with this idea that she would see it and just be terrified. And so I was going do a desensitizing exercise so that if she happened to see a white van, she would – she wouldn't have, just – be emotionally overwhelmed by it.
>
> [SHEARER'S TRIAL COUNSEL]: And this was because of the relationship between her and her husband?
>
> [DR. BAKER]: She described it as being abusive is the word she used over and over again.
>
> [SHEARER'S TRIAL COUNSEL]: And when she described it as being abusive over and over, what type of things would she tell you?
>
> [DR. BAKER]: About being hit, you know. She described multiple types of physical abuse, being punched and hit and him being in rages. She also described both of their alcohol abuse. That was also kind of in my notes as well, that she abused alcohol and he did too.

{¶ 37} Dr. Baker further testified that he observed Shearer to have a "low frustration tolerance," a condition that he described as a disproportionate reaction to the world around her. Concluding, although never claiming Tony had ever held a gun to her head, Dr. Baker testified Shearer "described high levels of fear related to being abused is what she said."

{¶ 38} Leah Lopez then testified in defense of Shearer. Lopez, who is Shearer's adult daughter, but who had no biological relationship with Tony, testified that "Tony was essentially like my father. He raised me since I was five years old." Lopez was then shown several photos taken of the inside of home located 3601 Ellis Way, pointing out multiple "patch marks" on the interior walls, as well as several damaged doors taken from the home. Lopez, however, did not testify how any of the walls and/or doors were damaged. Lopez further testified that she informed a detective the night of the shooting that she "had never seen [her] parents be physically fighting each other." Finally, when asked if there had been physical violence going on in the home that Shearer would have hidden it from her, Lopez testified "[m]ore than likely, yes. She would not have told me."

{¶ 39} Shearer then testified in her own defense. Shearer testified that she and Tony were married in June of 1994 after having dated for approximately eight months.[3] According to Shearer, her marriage to Tony started in the typical fashion – arguing over things like bills, money, and the kids. This all changed, however, when Tony suffered from a nervous breakdown in 2012 brought on by alleged past sexual abuse he sustained as a child, which ultimately resulted in him being hospitalized following a failed suicide attempt. As Shearer testified, "Tony wasn't never the same after that. Tony never really seemed to be happy, but there was also a lot of things at that time going on." This included instances where Tony was verbally and physically abusive towards her, pushing, shoving, slapping, and

---

3. According to the record, Shearer married Tony after breaking up with her high school sweetheart, who Shearer alleged was also physically abusive towards her.

choking her "a lot." Shearer also testified Tony would "hit the walls, kick the doors, throw things if he wanted to," behaviors that continued "[u]ntil the night of the shooting."

{¶ 40} Approximately four years after Tony's nervous breakdown, Shearer and Tony were divorced.[4] Shearer, however, testified she moved back in with Tony to reconcile their marriage because she loved him and thought that he was dying. As Shearer testified, "Tony actually told me he was dying. He told me his liver and his kidneys were shutting down and he needed to get confirmation from the doctor what for." To this, Shearer testified "I just figured I've been with him this long, I might as well stay with him till his passing." Specifically, when asked why she decided to move back in with Tony when he was abusive towards her, Shearer testified "I just thought things would change."

{¶ 41} Things did not change, but instead, according to Shearer, "[t]he arguments did become more. And then it would – he would like slap me in the face or push me. And then, he'd end up choking me with both of his hands. Now when that occurred, that did scare me, because he was suffocating me." According to Shearer, this caused her to "get fearful that [she] was going to die." Shearer also testified that Tony at one time picked up a nearby gun, "swung it around, put the gun to my head, and clicked. There was no clip in it." Thereafter, when again asked again why she stayed with Tony when he was abusive towards her, Shearer testified:

> I actually – he started buying a lot of guns. I was getting scared to even leave the house. You know, just a lot of things that he was doing was making me very fearful of him and I honestly didn't know how I was going to leave this time without him trying to kill himself. You really don't know the burden of someone's constantly trying to kill their selves (sic) and you going to carry the burden if he did kill himself. I did not want to carry that burden if he kills himself, it's my fault because I left. It's very hard. I mean, I don't know what answer anybody's wanting me

4. On cross-examination, Shearer acknowledged that she had not disclosed any abuse as part of the divorce proceedings. Shearer also acknowledged that she never went to the hospital or called the police, nor did Shearer ever confide in her family or children about the alleged abuse during her marriage to Tony.

to give on that because there really isn't one.  It's very hard to give an answer to that.

**{¶ 42}** Moving on to the day of the shooting, Shearer testified that Tony became upset with his brother, whom he worked with every day as a floor installer.  Specifically, Shearer testified that "[a]s a witness to working with him as an installer at times, sometimes we would pull in and just the sight of [his brother] would upset him."  On this occasion, Shearer testified that Tony became "irritated" with his brother, thus causing him to pick up a nearby gun case and throw it on the floor.  In response, Shearer testified that she went into the bedroom "just to get away from him."  Tony, however, broke through the door and, as Shearer testified, started "choking [her] out on the bed."  According to Shearer, this created a "very small scar" on her neck from Tony's jewelry "digging in" to her skin.

**{¶ 43}** Upon coming to, Shearer, who admitted to having "a couple of drinks" earlier in the day, testified she walked out of the bedroom and into the living room where Tony was talking on the phone with his mother asking her if she believed his claims that he had been sexually abused as a child.  When asked why she did not simply leave the house, Shearer testified that her keys were by the living room door and that her phone was on the desk next to a gun, the same gun Shearer testified she later used to shoot Tony in the head.  Seeing that she was trying to leave, Shearer testified Tony got up off the couch and "was very irritated about that."  Believing Tony was going to try and kill her, Shearer testified, "[w]hen I seen the anger in his eyes, and him yelling, and I could not hear what he was yelling because I was so scared, I grabbed the gun and I shot him."  When asked why she shot Tony that evening, Shearer testified she shot Tony in self-defense because "I really thought he was trying to kill me."

**{¶ 44}** Detective Lovejoy, who previously testified as part of the state's case-in-chief, was then called to testify in Shearer's defense.  Detective Lovejoy testified that jewelry was

taken from Tony's person after he was transported to the hospital, but that none of the jewelry was ever sent to the lab for DNA testing. Detective Lovejoy also testified that no fingernail scrapings were taken from Tony on the night in question. Detective Lovejoy testified, however, that he never had any reason to suspect any DNA evidence would be found under Tony's fingernails, thereby alleviating the need to conduct such testing. Detective Lovejoy further testified that there was nothing special about the broken bedroom door that he inspected and photographed that would necessitate that door being removed from the scene as part of the investigation into the shooting.

{¶ 45} Shearer next called Adam Plieman to testify in her defense. Adam Plieman is an audio engineer with Sound Images, a company that does work in, among others, "cleaning, restoration, and editing of dialogue for commercials and film, as well as in instances like this in forensic work * * *." Plieman testified that he analyzed two phone calls involving Shearer, one of which occurred approximately 20 minutes before the shooting, wherein Tony, seemingly upset, can be heard discussing his brother and his claims that he had been sexually abused as a child. The other recording, which occurred a month prior to the shooting, includes comments from Shearer claiming Tony had choked her and that he was threatening to kill himself, as well as several instances where Shearer can be heard telling Tony he is a "psycho" who is going through "bi-polar bullshit." Shearer can also be heard saying to Tony "[y]ou ain't a fucking man" and "[y]ou ain't a god damn man." The record indicates both recordings were authenticated and played for the jury.

{¶ 46} Detective Stewart, who also previously testified as part of the state's case-in-chief, was then called to testify in Shearer's defense. Detective Stewart testified that she reviewed photos that were on Shearer's phone as part of the investigation, which she then turned over to the state, who in turn provided them to Shearer's trial counsel through discovery. Included in these was a "selfie" photograph that Shearer had taken of herself, a

photograph that Detective Stewart testified she found insignificant in her investigation into the shooting.

{¶ 47} Finally, Shearer called Dr. Manges to testify in her defense. Dr. Manges, who, as noted above, is a forensic psychologist, testified as an expert witness regarding battered-woman's syndrome. Prior to providing such testimony, however, the record indicates Shearer's trial counsel agreed that he was limited in his questioning of Dr. Manges since, as the trial court stated, "the expert cannot opine that the complainant was a battered woman, nor testify that the defendant was a batterer or that [s]he is guilty of the crime." The trial court, however, did allow Dr. Manges to "answer pertinent medical questions regarding specific abnormal behaviors exhibited by women suffering from a syndrome but should never offer an opinion relative to the alleged battered woman in the case."

{¶ 48} In responding to Shearer's trial counsel's questions, Dr. Manges testified he conducted a five-hour interview and evaluation of Shearer while she was being held in the Butler County Jail. During this time, Dr. Manges testified he used questionnaires and other standardized tests to measure Shearer's "emotional functioning" and "response to trauma," from which he generated a report of his findings. The report, which was later provided to the state in discovery, was based on Dr. Manges expertise in battered-woman's syndrome, which he described as "a recognized psychological phenomenon where the individual, in this case a woman – could be a man, but in this case, a woman – has been mentally and physically and sometimes sexually abused by their spouse."

{¶ 49} According to Dr. Manges, a battered woman who has suffered from repeated instances of abuse develops a "sense of guilt" about leaving the abuser, which ultimately results in the battered woman "walking on eggshells, and they try to protect their loved one, the abuser, and try to protect themselves." As Dr. Manges testified, the battered woman is oftentimes "troubled. They may abuse alcohol themselves. They may go to the doctor's

office but not disclose why it is that they are in the doctor's office." Dr. Manges also testified that it was not uncommon for the battered woman to keep secret the fact that she was being abused, likely due to the shame or embarrassment that may arise from the fact that "they're married to a person who physically abuses them." When determining if someone is a battered woman, Dr. Manges testified he looks at "repeated conditions – repeated abuse – repeated beatings or repeated abuse, mental or sexual."

{¶ 50} Moving on to Shearer specifically, although never expressly stating his opinion as to whether Shearer suffered from battered-woman's syndrome, Dr. Manges testified that his testing revealed she was suffering from trauma and emotional distress. In so finding, Dr. Manges testified he came to this result after discussing the alleged incidents of abuse. Concluding, when asked what type of demeanor he would expect from someone that was being abused, thereby potentially suffering from battered-woman's syndrome, the following exchange occurred:

> [SHEARER'S TRIAL COUNSEL]: [W]hat type of demeanor do you expect, or what, typically, demeanors do they have in range of demeanors that someone may have that's being involved or being a victim of domestic violence?
>
> [DR. MANGES]: Well, it depends on who's asking the question and under what context the question's being asked. The person may have emotional upset (sic), or they may have been resigned to the circumstance and have flat affect. They can be emotionally overwrought. I mean, there's a range. It's not necessarily always the same, in which they respond to the questions.
>
> [SHEARER'S TRIAL COUNSEL]: And in addition to not always being the same, you discussed the flat affect. Is that avoidance?
>
> [DR. MANGES]: It could be. A flat affect means that they don't emote. They're not happy, sad, mad, glad. They're just flat. And so that – they're good poker players. They don't disclose what's going on for them emotionally. And that can happen as well.

Following the admission of her exhibits, Shearer then rested her defense.

*The State's Rebuttal*

{¶ 51} In rebuttal, the state called Dr. O'Donnell to testify. As noted above, Dr. O'Donnell, a forensic psychologist, was permitted to interview Shearer at the Butler County Jail "regarding Battered Person's Syndrome and [Shearer's] thoughts and actions as it relates to the Syndrome." Expanding on Dr. Manges testimony, Dr. O'Donnell testified regarding her understanding of battered-woman's syndrome, its origins, and how research has changed since battered-woman's syndrome was first introduced in the 1970s. Dr. O'Donnell then testified regarding the criteria that are generally looked for when assessing whether an individual could be considered a battered person, such as repeated experiences of traumatic abuse,"[h]igh levels of physiological and psychological arousals of systems," as well as "[h]igh levels of avoidance of, avoidance symptoms and numbing of emotions." According to Dr. O'Donnell, however, there is no empirical evidence to prove battered woman's syndrome meets rigorous diagnostic criteria. Not offering any other rebuttal testimony or evidence, the state then rested its case on rebuttal.

**The Jury's Verdict and the Trial Court's Sentence**

{¶ 52} After both parties rested, and after closing arguments were completed, the trial court provided the jury with its final instructions and released the jury to begin its deliberations. Shortly thereafter, upon coming to a unanimous verdict, the jury returned to the courtroom and issued its verdict finding Shearer guilty as charged, thereby rejecting Shearer's claim that she had acted in self-defense. The matter then proceeded to sentencing. At sentencing, the trial court determined that the charges were allied offenses of similar import subject to merger for purposes of sentencing and, upon the state's election, sentenced Shearer to serve a mandatory term of 15-years-to-life in prison for murder, with an additional, mandatory and consecutive three years in prison on the accompanying

firearm specification, for a total, aggregate prison term of 18-years-to-life. The trial court also ordered Shearer to pay court costs.

**The Appeal**

{¶ 53} Shearer now appeals, raising four assignments of error for review. For ease of discussion, Shearer's third assignment of error will be addressed out of order.

{¶ 54} Assignment of Error No. 1:

{¶ 55} APPELLANT'S SPEEDY TRIAL RIGHTS WERE VIOLATED WHEN SHE WAS COERCED INTO WAIVING HER SPEEDY TRIAL RIGHTS.

{¶ 56} In her first assignment of error, Shearer argues her conviction must be reversed and the charges against her dismissed since she was "coerced" into waiving her speedy trial rights. We disagree.

{¶ 57} The right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Section 10, Ohio Constitution. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶ 32. To preserve this right, the Ohio General Assembly enacted this state's speedy trial statutes found in R.C. 2945.71 through 2945.73. *State v. Miller*, 12th Dist. Warren No. CA2009-01-008, 2009-Ohio-4831, ¶ 8. As relevant here, R.C. 2945.71(C)(2) provides that a person against whom a charge of felony is pending "[s]hall be brought to trial within two hundred seventy days after the person's arrest." However, pursuant to 2945.71(E), "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." Compliance with these statutes is mandatory and the statutes "must be strictly construed against the state." *Id.*, citing *State v. Cox*, 12th Dist. Clermont No. CA2008-03-028, 2009-Ohio-928, ¶ 12.

{¶ 58} An appellate court's standard of review regarding speedy-trial issues involves a mixed question of law and fact. *State v. Messer*, 12th Dist. Clermont No. CA2006-10-

084, 2007-Ohio-5899, ¶ 7.  In conducting such a review, "the appellate court defers to the trial court's findings of fact as long as the findings are supported by competent, credible evidence, but the appellate court independently reviews whether the trial court properly applied the law to those facts."  *State v. Gellenbeck*, 12th Dist. Fayette No. CA2008-08-030, 2009-Ohio-1731, ¶ 8, citing *State v. Riley*, 162 Ohio App.3d 730, 2005-Ohio-4337, ¶ 19 (12th Dist.).

**{¶ 59}** As noted above, Shearer claims her conviction must be reversed and the charges against her dismissed since she was "coerced" into waiving her speedy trial rights. The record in this case contains no such waiver.  Rather, when faced with the potential of having her experts' testimony excluded from trial as a consequence of her violating the timing requirements found in Crim.R. 16(K), Shearer, on advice of her trial counsel, moved for a continuance.  While Shearer believes such a decision was coerced, we find Shearer's decision to move for a continuance was entered knowingly, intelligently, and voluntarily on the advice of counsel in order to provide her with the best chance of defending against the serious nature of the charges levied against her.  Shearer's claim otherwise lacks merit.

**{¶ 60}** In so holding, we specifically reject Shearer's claim that the "timing of the indictment and the subsequent motions in limine seem to be suspect," thereafter referring to the prosecutor's actions in challenging her experts' testimony under Crim.R. 16(K) as "disingenuous at best."  The record indicates this case was bound over to the Butler County Grand Jury on March 3, 2017, the matter thus falling under the trial court's jurisdiction from that date forward.  Shearer, however, seemingly resting on her laurels, did nothing to procure her experts' testimony until after she was indicted over a month later on April 5, 2017.  While this case may have diverged somewhat from the status quo, as the trial court stated, "while there was not an indictment filed, this court did have jurisdiction over the matter," during which "[it] will routinely hear motions prior to indictments, such as motions

for modification of bond or even bills of information, on cases that are assigned to this court prior to indictment." No such motions were filed in this case. Therefore, while we certainly understand and appreciate advocating one's position, particularly in a case of such magnitude, Shearer's accusations against the prosecutor in this case are unbecoming and unnecessary. Accordingly, finding no violation of Shearer's speedy trial rights necessitating her conviction be reversed and the charges against her dismissed, Shearer's first assignment of error lacks merit and is overruled.

{¶ 61} Assignment of Error No. 3:

{¶ 62} THE COURT ERRED IN ORDERING APPELLANT TO BE INTERVIEWED BY THE STATE'S EXPERT.

{¶ 63} In her third assignment of error, Shearer argues the trial court erred by requiring her to be interviewed by the state's expert, Dr. O'Donnell, which, we note, was limited by the trial court to "Battered Person's Syndrome and [Shearer's] thoughts and actions as it relates to the Syndrome." In support of this claim, Shearer argues the trial court's order requiring her to be interviewed by Dr. O'Donnell violated her Fifth Amendment right against self-incrimination. However, not only do we find Shearer likely waived this claim by not raising such a claim before the trial court, *see State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 9 ("issues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived"), the Ohio Supreme Court specifically rejected this claim in *Goff*, which held:

> [W]e conclude that when a defendant demonstrates an intention to use expert testimony from a psychiatric examination to establish that battered-woman syndrome caused in her "a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force," i.e., to use testimony on battered-woman syndrome to prove the second element of self-defense, *a court may compel the defendant to submit to an examination by another expert without violating the defendant's rights under Section 10, Article*

- 25 -

*I of the Ohio Constitution and the Fifth Amendment to the United States Constitution.*

(Emphasis added.) *Id.*, 2010-Ohio-6317 at ¶ 58, quoting *State v. Thomas*, 77 Ohio St.3d 323,326 (1997).

This is because, as the Ohio Supreme Court further stated in *Goff*:

> By putting her mental state directly at issue and introducing expert testimony based upon her own statements to the expert, the defendant opens the door to a limited examination by the state's expert concerning battered-woman syndrome and its effect on the defendant's behavior. Courts have the inherent authority to preserve fairness in the trial process, and allowing the defendant to present expert testimony on the specific effects of battered-woman syndrome on the defendant while denying the prosecution the ability to introduce such evidence would unfairly handicap the prosecution and prevent the trier of fact from making an informed decision.

*Id.*; *see also Kansas v. Cheever*, 571 U.S. 87, 134 S.Ct. 596, 601 (2013) ("[w]hen a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him").

{¶ 64} That is exactly what occurred here, through such a rigorous and thorough application of *Goff* to the facts of this case that both the trial court and the state should be commended. Therefore, finding no error in the trial court's decision to adhere to the law of this state as pronounced by the Ohio Supreme Court in *Goff*, Shearer's third assignment of error lacks merit and is overruled.

{¶ 65} Assignment of Error No. 2:

{¶ 66} STATEMENTS MADE BY THE PROSECUTION IN CLOSING CONSTITUTED PROSECUTORIAL MISCONDUCT AND AS A RESULT APPELLANT WAS PREJUDICIALLY AFFECTED.

{¶ 67} In her second assignment of error, Shearer argues her conviction must be

reversed due to the prosecutor's alleged misconduct during the state's rebuttal closing argument. We disagree.

**{¶ 68}** For her conviction to be reversed based on prosecutorial misconduct, Shearer must prove the prosecutor's comments during the state's closing argument were improper and that those comments prejudicially affected her substantial rights. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 62. In making such a determination, the focus is upon the fairness of the trial, not upon the culpability of the prosecutor. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. A finding of prosecutorial misconduct will not be grounds for reversal unless the defendant can demonstrate that she has been denied a fair trial because of the prosecutor's prejudicial remarks. *State v. Smith*, 12th Dist. Warren No. CA2017-02-013, 2017-Ohio-7540, ¶ 29.

**{¶ 69}** It is undisputed that Shearer's trial counsel did not object to the prosecutor's comments made during the state's rebuttal closing argument now at issue, thereby waiving all but plain error. *State v. Warwick*, 12th Dist. Preble No. CA2017-01-001, 2018-Ohio-139, ¶ 30. Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error does not exist unless the error is obvious and, but for the error, the outcome of the trial would have been different. *State v. Yanez*, 12th Dist. Butler No. CA2016-10-190, 2017-Ohio-7209, ¶ 23. Notice of plain error must be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 12. Prosecutorial misconduct may rise to the level of plain error only if it is clear from the record that the defendant would not have been convicted in the absence of the improper comments. *State v. Israel*, 12th Dist. Butler No. CA2010-07-170, 2011-Ohio-1474, ¶ 43.

**{¶ 70}** Shearer claims the prosecutor engaged in misconduct during the state's

rebuttal closing argument by impermissibly denigrating the role of her trial counsel. Specifically, Shearer takes issue with the prosecutor stating the following during the state's rebuttal closing argument:

> In fact, [Shearer's trial counsel] wanted to be a witness so bad in this case he was sending letters to witnesses trying to contact them. But what he doesn't tell you is the second half of that sentence which is contact me, but I'm not going to tell you why. Get in touch with me, but I'm not going to give you any indication as to why I want you to do so. Collect this door, but I can't tell you why. That's the other half.

{¶ 71} Shearer claims this "personal attack" on her trial counsel was an attempt by the prosecutor to "criticize [her trial counsel's] arguments, tactics, and his person," which had the potential to "dangerously taint" the jury's view of her trial counsel and of her entire defense strategy.

{¶ 72} Shearer, however, in challenging the prosecutor's statement set forth above, conveniently ignores the prosecutor's statements made immediately preceding, wherein the prosecutor stated:

> You know, it's interesting, when we started back on Monday, one of the things we talked about [is] the fact that the Court and everybody has a different role. The jury is the judges or the decider of the facts. The Judge tells you what the law is. And I thought, it's always been my understanding, that the attorneys are simply here to present to you what the evidence is, not to double as witnesses, not to substitute in as experts, not to interject themselves into the proceedings. Because everything I just heard [during Shearer's trial counsel's closing argument] was far different than the actual testimony that came out during this trial.

{¶ 73} After a thorough review of the record, and when taking the prosecutor's comments in conjunction with the trial court proceedings as a whole, we can find no instances of prosecutorial misconduct in these challenged statements, nor in any other statements made by the prosecutor during the state's closing argument. Rather, just as the state aptly notes as part of its appellate brief, the prosecutor's comments "were properly

responsive to the issue that counsel had argued at length;" namely, that the investigating officers assumed Shearer's guilt from the outset, thus ignoring potential exculpatory evidence even when questioned about that evidence by her trial counsel in the time leading up to trial. While the record is replete with examples exhibiting this defense strategy, we need look no further than Shearer's trial counsel's own closing argument, during which he began by stating, in pertinent part, the following:

> This case is about a search for the truth. * * * This is about a search for the truth. State of Ohio has a burden to prove, and this, what the lead detective told you. "You didn't care to call me back on the investigation, did you?" And I'm paraphrasing, but her answer was not paraphrased. "It's not that I didn't care, I just didn't do it." The State of Ohio has the burden to prove. This is a search for truth. It is not a search for – well, we've got to stop this and move on, it's (indiscernible). It is a search for the truth and this is the lead detectives final answer on cross-examination. "It's not that I didn't care, I just didn't do it." They have the burden, not the Defense. They have the burden.

Continuing, Shearer's trial counsel then stated:

> Why didn't you follow up on the investigation? Why didn't you call me back? They're asking you to find [Shearer] guilty of murder. Very serious case and they don't even care about calling [or returning our] phone call; it's because they want you to carry the water. Thank goodness for juries because your job is to look at everything and determine, to be fair, what's reasonable, what's not reasonable, what's truth, what's not truth, and search for the truth. And ultimately at the end of the day, that's what a just verdict is, searching for the truth, not searching for accountability, and definitely not just not doing it.

Shearer's trial counsel later reiterated this same point when he stated:

> Detectives knew immediately this could have been a self-defense case, immediately. So when they come up here and say, "Well, I didn't return phone calls. I didn't know." I don't know why they didn't return [our] phone calls. It just blows my mind in a murder case. But I digressed.

{¶ 74} By repeatedly questioning the investigating officers' tactics, which included interjecting his own credibility, thus implying that there may have been relevant, exculpatory

evidence that had been ignored by the police, the prosecutor would have been remiss had he not refuted such allegations, even if such comments referenced Shearer's trial counsel's actions leading up to trial. The prosecutor's comments, which we note spanned only a portion of a single page of the state's otherwise lengthy rebuttal closing argument, do not amount to prosecutorial misconduct, nor can it be said the prosecutor's comments contributed in any way to the jury's finding of guilt. Simply stated, even if the prosecutor had not made these comments, the record contains ample evidence to support the jury's verdict finding Shearer guilty as charged. Therefore, finding no error, let alone plain error, Shearer's second assignment of error alleging prosecutorial misconduct is without merit and overruled.

{¶ 75} Assignment of Error No. 4:

{¶ 76} THE COURT ERRED BY NOT ALLOWING APPELLANT'S EXPERT WITNESS TO TESTIFY THAT APPELLANT SUFFERED FROM BATTERED-WOMAN'S SYNDROME.

{¶ 77} In her fourth assignment of error, Shearer argues the trial court erred by "not allowing" her expert, Dr. Manges, to specifically testify that she "suffered" from battered-woman's syndrome at trial. However, as a simple review of the record reveals, Shearer's trial counsel never asked Dr. Manges whether Shearer "suffered" from battered-woman's syndrome at trial, much less proffered Dr. Manges' answer to such a question if it had been asked. Rather, it was Shearer's trial counsel himself who so limited Dr. Manges' testimony.

{¶ 78} As the record indicates, immediately prior to questioning Dr. Manges, Shearer's trial counsel notified the trial court that whether Shearer suffered from battered-woman's syndrome was "the jury's decision to make" so "he will go through what it is and the essential qualifications that he looks for and things of that nature." As a result, although the trial court may have agreed with this proposition, any error that may have occurred was

clearly invited by Shearer's trial counsel. Under the invited error doctrine, which is applied when trial counsel is "actively responsible" for the trial court's alleged error, a party is not entitled to take advantage of an error that he himself invited or induced the trial court to make. *State v. Wesley*, 12th Dist. Butler No. CA2015-04-077, 2015-Ohio-5031, ¶ 26. Such is the case here.

{¶ 79} Regardless, even if invited error did not apply in this case, as noted by the state, the totality of Dr. Manges' testimony elicited at trial was to the effect that Shearer "suffered" from battered-woman's syndrome. As noted above, although never expressly stating his opinion as to whether Shearer suffered from battered-woman's syndrome, Dr. Manges testified that his testing revealed she was suffering from trauma and emotional distress. In so finding, Dr. Manges testified he came to this result after discussing the alleged incidents of abuse, thus indicating Shearer was an individual whom he believed was suffering from battered-woman's syndrome. Therefore, even if invited error did not apply to this case, based on the facts and circumstances here, we can find no error requiring Shearer's conviction be reversed. Accordingly, finding no error within the trial court proceedings, Shearer's fourth assignment of error is without merit and overruled.

## Conclusion

{¶ 80} In light of the foregoing, having found no merit to any of the arguments raised by Shearer within her four assignments of error, Shearer's conviction for murdering her ex-husband, Tony, is affirmed.

{¶ 81} Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.