IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No. 18CA4 |
| vs. | : | |
| JOSHUA M. CONRAD, | : | DECISION AND JUDGMENT ENTRY |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Ryan Shepler, Logan, Ohio, for appellant[1].

Dave Yost, Ohio Attorney General, and Christopher L. Kinsler, Assistant Ohio Attorney General, Columbus, Ohio for appellee.

CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:1-18-19
ABELE, P.J.

{¶ 1} This is an appeal from a Hocking County Common Pleas Court judgment of conviction and sentence. A jury found Joshua Conrad, defendant below and appellant herein, guilty of aggravated murder, murder, aggravated robbery, aggravated burglary, grand theft, and having weapons while under disability. Appellant assigns two errors for review:

FIRST ASSIGNMENT OF ERROR:

"MR. CONRAD WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL, AS TRIAL COUNSEL'S

---

[1] Different counsel represented appellant at trial.

PERFORMANCE WAS DEFICIENT, AND THE DEFICIENT PERFORMANCE PREJUDICED THE DEFENSE."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN SENTENCING MR. CONRAD TO LIFE WITHOUT PAROLE PLUS THIRTY-SEVEN YEARS."

{¶ 2} In February 2017, a Hocking County Grand Jury returned an indictment that charged appellant with: Count I Aggravated Murder R.C. 2903.01(B); Count II Aggravated Murder R.C. 2903.01(B); Count III Murder R.C. 2903.02(A); Count IV Murder R.C. 2903.02(B); Count V Aggravated Robbery R.C. 2911.01(A)(1); Count VI Aggravated Burglary R.C. 2911.11(A)(1); Count VII Grand Theft R.C. 2913.02(A)(1); and Count VIII Having Weapons While Under Disability R.C. 2923.13(A)(4), along with firearm specifications for each count.

{¶ 3} At trial, Tamika Athey testified that she had known appellant since he dated her sister, and two years ago she also became appellant's friend. Athey had known Josh Cross about the same length of time, but she is not romantically involved with Cross or appellant. Athey stated that on August 31, 2016, she and appellant traveled to Circleville three times to buy heroin and cocaine. After the first two purchases, they injected the drugs. After the third purchase, she saved the drugs for later use. Later that evening, appellant asked Athey to contact Cross. Athey stated that Cross and appellant disliked each other. After they picked up Cross, around midnight Cross and appellant dropped Athey and her two-year old daughter at a home in Circleville. At approximately 2:30 a.m., appellant called Athey to tell her to call Cross because appellant had been shot. Athey, however, could not contact Cross, so she called appellant. Appellant then sent a message to "call Josh." At the conclusion of Athey's testimony, the trial court gave a limiting instruction that the drug use testimony should not be considered as character evidence, but rather to consider when deciding whether appellant was drug dependent as it related to the weapons under disability charge.

{¶ 4} Hocking County Deputy Sheriff Jason Miles testified that when he arrived at the home of the victim, Gary Stevens, in the early morning hours on August 31, 2016, he found a pickup truck backed into the driveway about fifteen feet off the roadway, and a male, later identified as appellant, on the ground about 20 yards from the truck. Miles stated that appellant could speak, but could not move his left side. Appellant also had a cell phone and money in his hands. Body camera video footage shows that appellant said, "the guy's dead. * * * The guy up there." When Miles asked "what happened to him?," appellant responded, "Exchange fire. All I did was mow his grass and he told me to come and get my money I went there and he pulled the gun on me. That was my payment for mowing his grass." Appellant continued, "He shot me and I shot him." When asked about his weapon, appellant stated, "I grabbed his gun from him." When asked if anyone else was there, appellant replied "No." When the back-up deputy arrived, Miles went to the home and found blood on the porch leading to the front door. Officers also found the victim on the kitchen floor, dead and face down.

{¶ 5} Hocking County Sheriff's Deputy Emily Kineer testified that, after she arrived and stayed with appellant, she noticed that he held a cell phone and a $20 bill. Kineer stated that appellant told her, "That guy's mean, I don't understand I just came to get my money. * * * I mowed his grass, he said you come by tonight I'll pay you, I stopped by to get my money. * * * that's when he just, when he answered the door he had a gun in his pocket." Kineer also testified that while she waited with appellant for EMS to arrive, Cross came up behind her. Kineer was not sure whether Cross came from the woods or where he had been prior to his appearance.

{¶ 6} Hocking County Sheriff's Detective Aaron Cherry testified that, after appellant's transport to OSU Hospital, Cherry collected a Puma shoe, size 10 ½, a sock, a pair of shorts,

underwear, some currency, jewelry, a piece of a bracelet and a neck brace. The currency included 8 two-dollar bills in a plastic bag in appellant's shorts. Cherry also stated that appellant had one shoe when he arrived at the hospital. The next day, Cherry returned to the victim's home and collected a spent bullet from the floor and a pair of sun glasses. Cherry also explained that he drove to the Franklin County Coroner's Office, where Stevens' body had been taken for autopsy, to collect a DNA slide.

{¶ 7} BCI Crime Scene Investigator Todd Fortner testified that he found the victim on the kitchen floor, two firearms in the debris, and kitchen drawers and contents on the floor. Fortner testified that, in addition to blood stains, he collected a shovel, a muddy gray sock balled up halfway up the driveway, and two firearms - a Ruger .380 caliber semi-automatic pistol and a Springfield XD .45 caliber semi-automatic pistol. He found the .45 about a foot and a half from the victim's feet and the .380 under the victim's feet. Fortner also collected a gray Puma size 10 ½ shoe and approximately $190 in cash found along the driveway. Fortner further testified about the ballistic events at the scene and stated that he found two casings from the .380 and two from the .45. On cross-examination, Fortner testified that all doors had been locked, except the front door, and all three vehicles in the driveway had been locked. He also testified that a front porch motion detector makes an audible tone inside the home.

{¶ 8} Hocking County Sheriff's Detective Derrick Shirey testified that he collected from the front porch light two bulbs and the glass cover. Shirey noted that both bulbs seemed "like they had been loosened."

{¶ 9} Hocking County Sheriff's Deputy Adam Wagner testified that he visited to the scene two days later and retrieved two sets of keys and a hair that had belonged to the victim. Hocking

County Sheriff's Lieutenant Dustin Robison also testified that he met with Athey and took photographs from her phone.

{¶ 10} Hocking County Sheriff's Detective Lieutenant Ed Downs testified that he took an oral swab from appellant and an oral swab and a gun shot residue kit from Joshua Cross. Testimony later indicated that Cross's hands had no gunshot residue. Downs also stated that he did not check appellant for gunshot residue because he had been life-flighted to a hospital. Downs explained that the victim's daughter called them after she noticed that the front porch light did not come on and discovered that the bulbs appeared to have been loosened. The bulbs and the two-dollar bills were also submitted to the lab for fingerprint analysis. On cross-examination, Downs testified that his investigation led to the conclusion that the victim owned both guns.

{¶ 11} BCI Forensic Firearms Examiner Andrew McClelland testified that he tested the two firearms, four fired cartridge casings, and a fired bullet. McClelland stated that he tested both the Ruger .380 semi-automatic pistol and the Springfield XD .45 semi-automatic pistol and determined that they are both operable, and that two casings and the bullet had been fired from the .45 and two casings had been fired from the .380. Additionally, the autopsy photographs indicated that the victim sustained gunshot wounds to the right upper part of the chest and the left armpit/shoulder area, with an exit wound on the back.

{¶ 12} BCI Forensic Scientist Kathryn Dailey testified that she conducted DNA tests on the firearms, an oral swab from Cross, an oral swab from the victim, jeans that belonged to Cross, a DNA standard from Cross and a pair of boots and swab from the front exterior door handle. Dailey determined that the Ruger .380 contained a DNA mixture with the major DNA profile consistent with the victim, and the minor DNA profile consistent with appellant. Testing excluded Cross from

the entire mixture. As for the Springfield .45 (1) the trigger area contained a mixture of DNA profiles - appellant the major DNA profile and excluded the victim and Cross from the major DNA profile; (2) on the handle, including the slide, a mixture of DNA profiles exists as well - appellant the major DNA profile, the victim the minor DNA profile, and excluded Cross; and (3) the blood on the barrel the DNA profile is consistent with appellant, and excluded both the victim and Cross. Cross's jeans, belt and boots had also been collected and sent to BCI and Dailey's tests (1) indicated that three of four stains are a mixture and Cross is the major DNA profile, (2) excluded appellant and the victim as the major DNA profile, and (3) determined the boot DNA profile and the DNA swab from the front door handle not suitable for comparison. On cross-examination, Dailey testified that she could not conclusively exclude Cross's handling of either firearm even without the presence of his DNA.

{¶ 13} BCI Forensic Scientist Ashley Owen testified that she tested the baggie, the currency found in the driveway and the porch light bulbs, but the tests are either negative or insufficient for legible fingerprints.

{¶ 14} The victim's daughter, Stacey Stevens, testified that her father owned both a .380 and a .45. She also testified that she found a bullet the day after her father's murder, but did not touch it and called police to retrieve it. She also found a set of unfamiliar keys on the floor, retrieved a hair from the kitchen counter and found sunglasses that did not appear to belong to her father. Stevens also testified that she found a receipt from an ATM that shows her father had withdrawn $200 on August 31. Stevens explained that her father typically kept money in the kitchen in a drawer under the microwave, but when she cleaned the house she did not find any money. Stevens further testified that her father kept his valuables, wallet and two-dollar bills in a wooden box. On the

floor, she found the empty wallet and the wooden box, overturned and broken. Also, Stevens indicated that the porch lights had been loosened and the light cover sitting on a porch chair. She also stated that her father's neighbor usually mowed the lower portion of her father's yard, and his home health care worker had also mowed for him, but when she arrived a few hours after the murder the grass did not appear to have been recently mowed.

{¶ 15} At the close of the state's case the state dismissed the firearm specifications as to Counts VII and VIII. Also, the defense made a Crim.R. 29 motion for judgment of acquittal as to the remaining counts and specifications, but the trial court denied the motion.

{¶ 16} The appellant, the sole witness for the defense, testified that he struggled with drug addiction for six years and had convictions for receiving stolen property and drugs. Appellant stated that he met Josh Cross in the local drug circle and had known him for about two and one-half years. Appellant explained that on August 31, 2016 he and Cross were not friends, but Athey wanted to rekindle their friendship. He testified that he and Athey met Cross at a Speedway and, around midnight, dropped Athey at a home in Circleville.

{¶ 17} Appellant stated that in the early morning hours, he and Cross drove around "just going country cruising just to talk." Appellant testified that after about thirty minutes (approximately 2:00 a.m.), Cross told him to stop at Stevens's home because Stevens owed Cross "a couple hundred bucks." Appellant said that Cross told him that he had a difficult relationship with the Stevens, so Cross would stay in the truck saying "my face don't need to be seen." Appellant explained that he parked his still-running truck headed toward the road because he missed the turn and backed into the driveway. Appellant stated that when he exited the truck, Cross sat in the passenger seat.

{¶ 18} Appellant testified that when he approached the house and knocked, Stevens opened the door and was "calm, fine, friendly." Appellant stated that Stevens told him that Cross had a bad work ethic, didn't know how to plumb and didn't show up on time or come when he said he would, and told appellant "I just want to give you this money and I'm just going to be done with him." Then, according to appellant, Stevens gave him the money and, as appellant put it in his shorts, he heard a doorbell sound that turned out to be the motion sensor. At that point, according to appellant, Stevens's demeanor changed and he appeared to get angry - "He instantly has a gun right here at his right hip and the barrel is looking straight up at me." Appellant stated that he tried to grab the gun and "that's where my memory shuts down because I heard a gunshot and * * * I don't know if it was five minutes or an hour later but * * * I took two bullets to the head so, it had taken me completely unconscious. Well when I come to, I was like I couldn't figure out where I was I couldn't I didn't know what happened. It took I don't know how much time but you know like I remembered oh yea I heard gun shots and so." Appellant, having been shot twice in his head, testified that he woke up with his head in a cabinet, had no movement on his left side, and pulled out drawers to help him stand. Appellant stated that he did not see the victim get shot and that he did not shoot him, and when asked, "could you have caused him to be shot when you were grasping for his gun," appellant replied, "I really didn't, I really, I mean maybe." Appellant further testified that (1) he did not call 911 because he could not talk and he did not know the address, so he did not know how to give the dispatcher his location, (2) he called Athey, but did not recall talking to her, (3) he had no recollection how he got from the home to the driveway, (4) at the hospital, he learned that one bullet lodged in his brain, and (5) he entered the victim's home only to retrieve money for Cross, not to rob or kill the victim. Instead, appellant claimed that Josh Cross came to the house and killed the

victim.

{¶ 19} On cross-examination, the state asked appellant why his pocket contained 8 two-dollar bills enclosed in a plastic bag. Appellant did not know. The state asked, "And it's your testimony that you never touched the gun accept (sic) I guess when you came to and the gun was on the floor and your (sic) trying to get up. Is that correct?" Appellant: "Correct." The state: "And in so doing you put your DNA on the gun correct?" Appellant: "I assume yes." On cross-examination, the state asked, "But your testimony today would be that you never grabbed his gun correct?" Appellant: "Well when he pulled it on me I, I you know, I went to be like you know hey what are you doing? But I didn't, I don't, he shot me so fast I don't know if I touched it or not." The state also highlighted two body cam videos (from Miles and Kineer) that depicted appellant telling the deputies at the scene that he was at the house trying to get money because he mowed Stevens's grass.

{¶ 20} At the close of the evidence, appellant renewed his Crim.R. 29 motion for a judgment of acquittal. Once again, the trial court overruled the motion.

{¶ 21} After deliberation, the jury found appellant guilty on all eight counts and all firearm specifications. At sentencing, the state conceded that Counts II (Aggravated Murder), Count III (Murder) and Count IV (Murder) merged with Count I (Aggravated Murder). The trial court agreed and concluded that Count II, Count III, and Count IV merged with Count I, and sentenced appellant to serve (1) a definite term of life with no possibility of parole on Count I (Aggravated Murder), (2) 11 years in prison on Count V (Aggravated Robbery), (3) 11 years in prison on Count VI (Aggravated Burglary), (4) 36 months on Count VII (Grand Theft), and (5) 36 months on Count VIII (Weapons Under Disability), with sentences to be served consecutively to each other, for a combined term on Count V, Count VI, Count VII, and Count VIII of 28 years in prison. In addition, the court

ordered the 3 year firearm specification on Count I, Count V, and Count VI be served consecutively to each other for a combined term of 9 years in prison. Thus, the court sentenced appellant to serve a total prison term of life in prison without parole, plus 37 years. This appeal followed.

I.

{¶ 22} In his first assignment of error, appellant asserts that his trial counsel provided constitutionally ineffective assistance by failing to (1) argue self-defense and requesting a self-defense jury instruction, rather than characterizing Cross as responsible for the murder, (2) argue for the exclusion of appellant's body camera "interview," or, in the alternative, to obtain an expert witness to explain the severity of appellant's brain injury and the discrepancies between his body camera "interview" and his trial testimony. Appellant also contends that counsel's actions caused the verdict to be against the manifest weight of the evidence, thereby prejudicing appellant.

{¶ 23} In *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, the United States Supreme Court set forth the standard for judging ineffective assistance claims. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687-688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Further, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 24} A reversal of a conviction on the basis of ineffective assistance of counsel requires that a defendant show that (1) counsel's performance was deficient, and (2) the deficient

performance prejudiced the defense so as to deprive the defendant of a fair trial. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205. To establish prejudice, an appellant must show that a reasonable probability exists that, but for the alleged errors, the result of the proceeding would have been different. *State v. Conway* (2006), 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95, citing *Strickland, supra*, and *Bradley*, *supra.*

A.

{¶ 25} Once again, appellant contends that counsel provided ineffective assistance by (1) failing to argue self-defense and requesting a self-defense jury instruction, and (2) asserting that Cross is responsible for the homicide. Appellant's argument centers on the idea that accusing Cross as the perpetrator is implausible, and a better theory would have been to argue self-defense. However, as the state aptly points out, appellant, himself, insisted during his trial testimony that Cross is indeed the killer:

> "Counsel: Based on everything you know now did you fire that
>
> weapon that killed Mr. Stevens?
>
> Appellant: Absolutely not.
>
> Counsel: Based on what you know now, who killed Mr. Stevens?
>
> Appellant: Josh Cross did."

In view of appellant's own testimony, the state contends that counsel could not have argued self-defense because doing so would have undermined appellant's testimony.

{¶ 26} Generally, "debatable trial tactics do not establish ineffective assistance of counsel." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45, citing *State v. Campbell*, 90 Ohio St.3d 320, 339, 738 N.E.2d 1178 (2000); *State v. Otte,* 74 Ohio St.3d 555, 565,

660 N.E.2d 711 (1996). Here, while self-defense arguably would have been a reasonable trial strategy, our review of the record reveals that appellant, himself, asserted that he did not kill Stevens. Instead, appellant asserted that Cross killed Stevens. Self-defense is an affirmative defense that requires a defendant to prove three elements by a preponderance of the evidence: (1) the defendant is not at fault in creating the violent situation, (2) the defendant had a bona fide belief of imminent danger of death or great bodily harm and that the only means of escape is the use of force, and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997); R.C. 2901.05.

**{¶ 27}** In the case at bar, we do not believe, in light of the evidence adduced at trial, that appellant could have established the elements of self-defense. Once again, appellant testified that he did not shoot the victim, but instead, Cross shot Stevens. Consequently, we see no reason for trial counsel to have requested a self-defense instruction when appellant testified that he did not kill the victim. While one may argue that the physical evidence may have made appellant's argument that he did not shoot the victim less plausible, counsel may not simply select in the abstract the most arguably effective theory of defense. Rather, counsel must advance an argument in light of the defendant's version of the facts. Counsel may not simply create or manufacture facts. Again, appellant, in the case sub judice, denied shooting the victim. During appellant's trial testimony, he did not testify that he shot the victim due to a fear of death or serious bodily harm, but that Cross shot the victim. Thus, an argument that appellant should have pursued a self-defense strategy fails under the weight of appellant's own trial testimony. We recognize, however, that appellant's statements at the scene appear to conflict with his trial testimony. Nevertheless, trial counsel cannot

be faulted because of appellant's inconsistent recitation of the facts.

B.

{¶ 28} Appellant also asserts that trial counsel performed ineffectively because counsel either failed to (1) object to the admission into evidence the statements appellant made to officers at the scene, as recorded on body cameras, or (2) present expert testimony to explain appellant's statements as a product of serious brain injuries sustained from the gun shot wound. Thus, the thrust of appellant's argument is that his injury rendered him incapable of making lucid or accurate statements.

{¶ 29} Initially, we point out that appellant's statements are admissible in evidence. See Evid.R. 801(D)2). As for the suggestion that trial counsel should have obtained testimony from a neurological expert to support the contention that appellant's statements were a product of confusion that resulted from brain injury, appellant bears the burden to show that such expert testimony would have impacted the outcome of this case. Speculation on appellant's part, however, is not sufficient to satisfy this burden. *See State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217 (nothing in record justifies inference that state promised immunity to witness), citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 219 (failure to cross-examine witness about other witness testimony was not ineffective and was speculative), and *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 121 (failure to call witness was not ineffective when it was fully speculative whether witness could have given favorable testimony). Our review of the record reveals that appellant's testimony and trial participation does not appear to

indicate that he lackED the capacity to testify or to assist in his defense.[2]  Our review reveals that appellant's conversation with the deputies at the scene appears to have served appellant's goal of denying responsibility for the crime and, instead, setting forth his claim that he arrived at the victim's home, unannounced and at approximately 2:00 a.m., merely to collect his fee for mowing the victim's yard.

### C.

{¶ 30} Finally, appellant contends that trial counsel's ineffectiveness caused the jury's verdict to be against the manifest weight of the evidence and, therefore, prejudiced appellant.  Appellant alleges that, had counsel advanced the "appropriate theory of the case," the jury would have found that the victim invited appellant into the house, that any "exchange" of gunfire occurred in self-defense, and appellant would not have been convicted of any crime.  However, as we point out above, these assertions are mere speculation.  Once again, trial counsel is obligated to present a theory consistent with the appellant's version of the facts, not simply concoct a defense that, in counsel's judgment, could possibly prove to be more effective than the appellant's version of the facts, as stated at trial.

{¶ 31} Thus, we believe, after our review of the record, that appellant failed to show that counsel's representation fell below an objective standard of reasonableness or that, but for counsel's conduct, the result of the proceeding would have been different.  *Strickland*, *supra*, at 687, 694.  As such, we overrule appellant's first assignment of error.

---

[2] If, however, appellant does have evidence outside this record that could have a bearing on appellant's competence, memory or lucidity, he could pursue this claim through the post-conviction relief process.

II.

{¶ 32} In his second assignment of error, appellant asserts that the trial court erred in sentencing him to life without parole plus thirty-seven years.  We first consider the standard of our review.

{¶ 33} R.C. 2941.25 sets forth the scenarios when multiple punishments can be imposed:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 34} The Supreme Court of Ohio recently examined the allied offense doctrine and affirmed that "R.C. 2941.25(A) allows only a single conviction for conduct that constitutes 'allied offenses of similar import.'"  *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 13, citing *State v. Moss*, 69 Ohio St.2d 515, 519, 433 N.E.2d 181 (1982).  "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors - the conduct, the animus, and the import."  *Ruff* at paragraph one of the syllabus.  Further, "[t]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable."  *Ruff*, paragraph two of the syllabus.  Finally, "[u]nder R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or

(3) the conduct shows that the offenses were committed with separate animus." *Ruff*, paragraph three of the syllabus.

**{¶ 35}** The *Ruff* court wrote that "when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately?  And (3) Were they committed with separate animus or motivation?  An affirmative answer to any of the above will permit separate convictions." *Ruff* at ¶ 31.  Further, unlike at trial where the state bears the burden of proof, at sentencing "[t]he defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987).  Finally, we review the trial court's determination of allied offenses de novo.  *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

A.

**{¶ 36}** The first two parts of appellant's second assignment of error involve arguments as to the merger.  First, appellant contends that under *Ruff*, the trial court should have merged Counts V (Aggravated Robbery), VI (Aggravated Burglary), VII (Grand Theft), and VIII (Having Weapons Under Disability) into Count I (Aggravated Murder) and sentenced appellant only on aggravated murder.  In particular, appellant argues that under the state's theory of the case, appellant used a deadly weapon (an element of both aggravated burglary and aggravated robbery) to murder Stevens and steal while in his home.  Thus, appellant contends, under the state's theory of the case appellant committed these crimes simultaneously, as one course of conduct.  Appellant thus argues that his

sentences for aggravated robbery, aggravated burglary, grand theft and having weapons under disability "are not dissimilar import, as the harm from each of these charges is not separate and identifiable." Second, appellant alleges that the trial court erred by failing to merge Count V (Aggravated Robbery) and Count VI (Grand Theft) because, appellant contends, aggravated robbery includes theft as an element and theft is, therefore, a lesser included offense of aggravated robbery.

{¶ 37} In the case sub judice, appellant's aggravated robbery conviction is based on R.C. 2911.01(A)(1), which provides in pertinent part: "No person, in attempting or committing a theft offense, * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]'" Appellant's conviction for aggravated burglary is based on R.C. 2911.11(A)(1), which provides in relevant part: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another [.]" Appellant's conviction for grand theft is based on R.C. 2913.02(A)(1), which provides in pertinent part: "No person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * [w]ithout the consent of the owner or person authorized to give consent[.]" Finally, appellant's conviction for having weapons under disability is based on R.C. 2923.13(A)(4), which provides in relevant part: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is drug dependent, in danger of drug dependence, or a chronic alcoholic."

{¶ 38} Appellant focuses on the first prong of the *Ruff* analysis and maintains the offenses are

not of dissimilar import, as the harm from each of these charges is not separate and identifiable. We, however, disagree with appellant.  In *State v. Gillman*, 4th Dist. Vinton No. 14CA699, 2015-Ohio-4421, 46 N.E.3d 130, this court held that burglary and theft are not allied offenses because the harm from each offense is separate and identifiable.  We held that the victim's sense of privacy had been invaded and compromised as the harm that resulted from the burglary offenses, and the victim suffered economic damage as a result of the theft offenses.  *Gillman* at ¶ 23.  This court has also held that felonious assault and aggravated burglary do not merge when a separate identifiable harm exists for each offense when the victim suffered psychological injuries, as a result of the aggravated burglary, and separate physical injuries, as a result of the felonious assault that occurred during the burglary.  *State v. Craig*, 4th Dist. Athens No. 15CA22, 2017-Ohio-4342, ¶ 32. Furthermore, the Fifth District has held that aggravated robbery and aggravated burglary have separate and identifiable harm, in that one involves the separate harm of violating the sanctity of a citizen's home.  *State v. Lewis,* 5th Dist. Richland No. 15CA106, 2016-Ohio-7002, 72 N.E.3d 48, ¶ 30, citing *State v. Howard*, 5th Dist. Stark No. 2012CA00061, 2013-Ohio-2884, ¶ 58, in part citing *Minnesota v. Carter*, 525 U.S. 83, 100, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

{¶ 39} Turning to the case sub judice, in Count I (Aggravated Murder) Gary Stevens suffered two gunshot wounds, one fatal.  In Count V (Aggravated Robbery) Stevens suffered the separate and identifiable economic harm of the theft of money from his home.  In Count VI (Aggravated Burglary) Stevens suffered the invasion of privacy, similar to what the victim articulated in *Gillman*.  In Count VII (Grand Theft) Stevens suffered the theft of the .45 caliber firearm.  This harm is separate and distinct from the theft of money, or the fatal harm caused by the murder.  In Count VIII (Having Weapons While Under Disability), the victim is the state of Ohio, which is separate and

identifiable from the harm caused to Gary Stevens.

{¶ 40} As for appellant's merger argument regarding aggravated robbery and grand theft, although the Fifth District found in *State v. Lewis*, *supra*, at ¶ 26-27, that aggravated robbery and grand theft are allied offenses, the court emphasized that both offenses stemmed from appellant's stealing of the same items. Here, however, appellant's convictions are based on the theft of separate items - the grand theft pertained to the firearm, and the underlying theft in the aggravated robbery addressed the firearm and the money found on appellant and folded up in the driveway near appellant. Because each offense has a separate and identifiable harm, each is dissimilar in import and significance and not subject to merger. Thus, it is unnecessary to address the second or third prongs of the *Ruff* test.

B.

{¶ 41} The third part of appellant's second assignment of error urges reversal of the sentence of life without possibility of parole for aggravated murder. In particular, appellant asserts that the trial court did not consider the principles of felony sentencing, noting that he will be disabled as a result of his crimes, and indicating that his prior criminal record consists of low-level, non-violent felonies. However, a sentence for aggravated murder is not subject to appellate review. R.C. 2953.08(D)(3) provides: "[a] sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." The Supreme Court of Ohio has confirmed, "a sentence for aggravated murder * * * is not subject to review under [R.C. 2953.08]." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 18. Moreover, this court has held "pursuant to R.C. 2953.08(D)(3), we lack statutory authority to review * * * [a] sentence [for aggravated murder] on an evidentiary basis." *State v. Hawkins*, 4th Dist.

Gallia No. 13CA3, 2014-Ohio-1224, ¶ 15; *see also State v. Payton,* 4th Dist. Scioto No. 17CA3793, 2018-Ohio-1376, ¶ 2, and *State v. Vance*, 4th Dist. Jackson No. 16CA11, 2018-Ohio-1313, ¶ 38. Thus, we overrule appellant's second assignment of error.

**{¶ 42}** Accordingly, based upon the foregoing reasons, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Hocking County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.   The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.   If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.   Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, J. & Hoover, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Presiding Judge

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.